# IN RE: TUTU WELLS CONTAMINATION LITIGATION

Master Docket No. 1989-107-1227

Civil Docket No. 1996-54(B)

District Court of the Virgin Islands

Div. of St. Croix

February 18, 1998

276

277

278

GITA F. ROTHSCHILD, ESQ., (McCarter & English), *for Third-party Defendants First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom*

ROBERT B. ANDERSON, ESQ., AND PAUL A. BRADLEY, ESQ., (McCarter & English), *for Third-party Defendants First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom*

JAMES M. DERR, ESQ., St. Thomas, U.S.V.I., *for Third-party Defendants First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom*

KEVIN J. CURNIN, ESQ., and BRIAN M. COGAN, ESQ., (Stroock & Stroock & Lavan, LLP), *for Third-party Defendant Goldman, Sachs & Co.*

GERALD T. GRONER, ESQ., Christiansted, St. Croix, U.S.V.I., *for Third-party Defendant Goldman, Sachs & Co.*

CHRISTOPHER R. GIBSON, ESQ., and ROBERT T. LEHMAN, ESQ., (Archer & Greiner), *for Third-party Plaintiffs Esso Virgin Islands, Inc., and Esso Standard Oil (Puerto Rico)*

DOUGLAS L. CAPDEVILLE, ESQ., Christiansted, St. Croix, U.S.V.I., *for Third-party Plaintiffs Esso Virgin Islands, Inc., and Esso Standard Oil (Puerto Rico)*

JAMIE D. BATTERMAN, ESQ., ROBERT L. TOFEL, ESQ., and MARK A. LOPEMAN, ESQ., (TOFEL BERELSON SAXL & PARTNERS, P.C.), NEW YORK, N.Y. *for Third-party Defendants Andreas Gal, Paul Lazare, Panex Co., and the Panex Industries, Inc., Liquidating Trust*

KEVIN A. RAMES, ESQ., Christiansted, St. Croix, U.S.V.I., *for Third-party Defendants Andreas Gal, Paul Lazare, Panex Co., and the Panex Industries, Inc. Liquidating Trust*

NANCY D'ANNA, ESQ., St. John, U.S.V.I., *for Third-party Plaintiff L'Henri*

ADDISON J. MEYERS, ESQ., (O'Connor & Meyers), *for Third-party Plaintiffs Texaco, Inc., and Texaco Caribbean, Inc.*

JOHN ZEBEDEE, ESQ., (Hymes, Zebedee & Smock), Charlotte Amalie, St. Thomas, U.S.V.I., *for Third-party Plaintiff Vernon Morgan*

GARY M. ALIZZEO, ESQ., (Assistant Attorney General, Government of the Virgin Islands, Department of Justice), Charlotte Amalie, St. Thomas, U.S.V.I., *for Third-party Plaintiff Government of the Virgin Islands Department of Education*

SUSAN AKERS, ESQ., (United States Attorney), St. Thomas, U.S.V.I.

JOHN R. COON, ESQ., (Wright, Coon & Cunningham, P.A.), *for Third-party Plaintiff Western Auto Supply Co.*

BROTMAN, *Judge*

### OPINION ON: (1) MOTION BY THIRD-PARTY DEFENDANTS GAL, LAZARE, PANEX CO., AND PANEX INDUSTRIES, INC. STOCKHOLDERS LIQUIDATING TRUST TO DISMISS AND FOR SUMMARY JUDGMENT (CONVERTED TO MOTION FOR SUMMRY JUDGMENT) FILED 8/29/96; (2) MOTION BY THIRD-PARTY PLAINTIFF ESSO FOR SUMMARY JUDGMENT AS TO GAL AND LAZARE FILED 2/20/97; (3) MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT BY THIRD-PARTY DEFENDANTS GOLDMAN, SACHS & CO., FIRST MANHATTAN CO., FIRMANCO ASSOCIATES, AND DANIEL ROSENBLOOM FILED 7/15/97; AND (4) CROSS-MOTIONS BY ESSO, TEXACO, L'HENRI, WESTERN AUTO AND GOVERNMENT OF THE VIRGIN ISLANDS DEPARTMENT OF EDUCATION FOR VOLUNTARY DISMISSAL WITHOUT PREJUDICE OF THIRD-PARTY DEFENDANTS GOLDMAN, SACHS & CO., FIRST MANHATTAN CO., FIRMANCO ASSOCIATES, AND DANIEL ROSENBLOOM FILED 10/14/97, 10/30/97, 10/16/97

## I. Background

*A. Introduction*

This case has its inception as far back as July 8, 1987, when Eric Tillet detected odors of gasoline emanating from a well located on No. 186 Estate Anna's Retreat in the Tutu region on the island of St. Thomas, U.S. Virgin Islands. Tillet contacted the Department of Planning and Natural Resources of the Territory of the Virgin Islands ("DPNR"), which contacted and conferred with the United States Environmental Protection Agency ("EPA").

On or about August 7, 1987, the DPNR ordered the closure of the wells of the Four Winds Plaza Partnership located at No. 392 Estate Anna's Retreat, of the wells of PID, Inc., and of wells on property owned by the Harthman family. *See* EPA Administrative Order of Consent, Index No. 11-RCRA-Proceeding 7003 & 9003-02-0401, dated Feb. 19, 1992 ¶ 6; *see also* PID Compl. ¶¶ 15-16, and Four Winds Compl. ¶¶ 13-14. As a result of DPNR orders, eighteen wells were closed between July 31 and September 2, 1987.

By late July 1987, the EPA had begun its investigation of the suspected pollution of the Tutu Water Wells under the provisions

of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9615 (West 1995) (hereinafter "CERCLA") and the Resource Conservation and Recovery Act, 42 U.S.C. § 6991 *et seq.* (West 1995) ("RCRA"). On August 10 and 11, 1987, the EPA collected water samples from twenty-four wells located in the Tutu section of Anna's Retreat within what is known as the Turpentine Run Aquifer. An analysis of the recovered samples revealed the presence of 1,2-Trans-Dichloroethylene ("DCE"), Trichloroethylene ("TCE"), Tetrachloroethylene ("PCE"), Toluene ("TOL"), benzene, and Terbutylmethylether ("TBME"). In October of 1987, the EPA collected additional samples from twenty-four wells. The analysis of these samples revealed that DCE, TCE, PCE, and TBME are the major contaminants of the water. *See* Consent Order at ¶ 11. In January 1988, after taking additional samples from 123 cisterns serviced by area water haulers, the EPA initiated a limited CERCLA Removal Action, which included the cleaning of some cisterns, the providing of a temporary alternative water supply, and monitoring of the well water. *See id.* at ¶¶ 8-12. A photovac sampling in 1989 showed high levels of benzene, TCE, and PCE. *See id.* at ¶ 13. Benzene, DCE, PCE, TCE, TOL, and TBME are gasoline additives, petroleum derivatives, or components of cleaning solvents used by service stations. PCE is also a common component of dry cleaning fluids.

In 1987 and 1988, the EPA issued a series of unilateral orders to Esso Standard Oil, S.A. (hereinafter "Esso"); Daniel Bayard; Texaco, Inc., Texaco Caribbean, Inc., and Vernon Morgan (collectively referred to herein as "Texaco"); and L'Henri Dry Cleaners ("L'Henri") (sometimes referred to herein as "O'Henry"), requiring them to supply information about the underground storage tanks in which they kept their gasoline and about their use or handling of PCE. The orders also required them to conduct soil vapor surveys. *See id.* at ¶¶ 14-33. The surveys confirmed the presence of TCE, PCE, DCE, and benzene at the Esso facility and at the Four Winds Parking Lot. *See id.* at 20-22. Texaco also submitted information confirming that gasoline had leaked from its underground storage tanks. *See id.* at ¶¶ 25-26. Soil samples at the L'Henri facility contained PCE in concentrations of 440 parts per million. *See id.* at ¶ 33.

In March 1989, the EPA completed preliminary assessments of potentially responsible parties (hereinafter "PRPs") in the area. These parties included Ramsay Motors, Inc; the old Laga clothing manufacturing facility, which is now owned by the Virgin Islands Department of Education (hereinafter "VIDE"); and others. Pursuant to the provisions of CERCLA and RCRA, the EPA on March 22, 1990 issued a Unilateral Consent Order against Esso, Texaco, and L'Henri, requiring them to take over a well-monitoring program. *See id.* at ¶ 4; EPA Administrative Order, Index No. 11-CERCLA-00401, RCRA-90-UST-9003-0401, dated Mar. 22, 1990, § VII, at 11-13 ("Unilateral Order").

*B. The History of "Laga"*

The EPA's search for those responsible for the contamination of the Tutu aquifer resulted in the naming of another PRP. Laga Industries, Ltd. ("Laga"), organized under Virgin Islands law, operated a textile manufacturing plant, also in Estate Anna's Retreat. The primary chemical discovered on Laga's property was PCE, which had been allegedly discharged via underground pipes into the ground as a result of Laga's on-site dry cleaning operations — a final step in the manufacturing process of Laga's textile products.

It is worth noting portions of Laga's history in the Virgin Islands. In 1970, Laga's initial shareholders and officers, Paul Lazare and Andreas Gal (hereinafter "Lazare" and "Gal"), sold Laga to The Duplan Corporation ("Duplan"), a Delaware corporation. Gal and Lazare stayed on as directors and majority shareholders of Duplan. As a result of the sale, Duplan owned one hundred percent (100%) of Laga's shares. *See* Oct. 4, 1994 Lazare Dep. Laga was administratively dissolved in 1981 for failure to pay corporate franchise taxes.

On August 31, 1976, Duplan filed for Chapter XI reorganization. By court order dated October 5, 1976, Duplan's bankruptcy proceeding was converted into a chapter X proceeding. In 1979, Duplan received authorization from the bankruptcy court to sell the Laga facility to Panex Co., a partnership composed of Gal and Lazare. This sale was formally consummated on December 12, 1979. Panex Co. later sold the property to the Government of the Virgin Islands, specifically to VIDE.

Duplan's Plan of Reorganization, and the bankruptcy court's order of June 4, 1981, directed, among other matters, that Laga be dissolved.[1] The Plan further provided that holders of subordinated notes and debentures in Duplan were to receive new common stock in the successor corporation.[2] On July 11, 1981, Duplan was renamed Panex Industries, Inc. (hereinafter "Panex").[3] Article VIII of the Restated Certificate provides that, to the extent authorized under Delaware law, certain directors, officers and other identified persons could be indemnified by Panex.[4]

On September 18, 1981, the Board of Directors of Panex met and decided the following: that (1) 1,211,242 shares of Panex common stock would be issued to the holders of convertible subordinated debentures; that (2) Wundies, Inc., a subsidiary which manufactured ladies' and girls' undergarments and sleep wear, would be merged into Panex; and (3) pursuant to § 9.1 of the Reorganization Plan, Lady Suzanne Foundation, Inc. and Laga were to be dissolved. This Board meeting, as with subsequent meetings, was conducted by Daniel Rosenbloom, Chairman of the Board, a third-party defendant herein and a general partner of First Manhattan Co. *See* Oct. 5, 1994 Rosenbloom Dep. at 157.

As a result of these reorganizations and dissolutions, Gal and Lazare became the owners of twenty-seven percent (27%) of the common stock of Panex, and Firmanco Associates became the owner of forty percent (40%) of Panex. Firmanco was a limited partnership of which Rosenbloom is a general partner. Firmanco was formed to buy shares of stock in Panex from certain banks. Rosenbloom later became Chairman of the Board of Panex and a trustee of the Panex Trust.

---

[1] *See* Aff. of Joseph Zuckerman ("Zuckerman Aff.") dated July 5, 1994, filed in the U.S. District Court, Western District of New York, in Case No. 94-CV-0400E(H), *The State of New York, et al. v. Panex Indus., Inc., et al.*, at Exh. A thereto, pp. B-4, B-15 at Art. IX, and B-18.

[2] Zuckerman Aff. and Exh. A thereto, p. B-12, Art. V.

[3] Zuckerman Aff. and Exh. J thereto, p. 2. The Court will continue to refer to the entity known as Panex Industries, Inc. as "Panex," as distinguished from Panex Co. and the Panex Industries, Inc. Liquidating Trust ("the Panex Trust"), for the sake of clarity throughout this opinion.

[4] *Id.* at p. 4.

Panex possessed two major assets: Rochester Button and Wundies, Inc. On March 22, 1984, Panex sold the assets of Rochester Button to the Alpine Group ("Alpine"). However, under the terms of the agreement, a facility in Wellsville,[5] New York, which the State of New York alleged sent hazardous substances to that town's landfill, was specifically exempted from the assets purchased by Alpine.

On July 26, 1984, after the Rochester Button sale, the Board of Directors met to consider the adoption of a plan of complete liquidation. On August 9, 1984, the Board arrived at and approved a Liquidation Plan for Panex, pursuant to which substantially all of Wundies, Inc.'s assets were to be sold. The Plan also provided that the Panex Trust would be formed to satisfy the contingent liabilities of Panex. The Panex Trust was to be initially funded with $6 million reserved from the funds received from the liquidation.

On August 31, 1984, a Proxy Statement describing the Liquidation Plan was distributed to all Panex shareholders, which disclosed that:

**IT IS POSSIBLE THAT THE AMOUNT HELD IN TRUST TO COVER CONTINGENT AND OTHER LIABILITIES OF PANEX WILL BE USED TO DISCHARGE SUCH LIABILITIES . . . MOREOVER, ALTHOUGH THE BOARD OF DIRECTORS BELIEVES THAT THE AMOUNT OF APPROXIMATELY $6 MILLION WHICH WILL BE DEPOSITED IN THE LIQUIDATING TRUST WILL BE SUFFICIENT TO COVER ANY LIABILITIES WHICH MAY ARISE DURING OR AFTER THE LIQUIDATING PERIOD, THERE CAN BE NO ASSURANCE THAT THIS WILL BE THE CASE. IF THE AMOUNT HELD IN THE LIQUIDATING TRUST IS INSUFFICIENT TO DISCHARGE FULLY ALL LIABILITIES WHICH MAY ARISE AFTER THE TRUST IS TERMINATED, EACH PANEX STOCKHOLDER MAY BE LIABLE FOR ANY UNPAID PORTION OF SUCH LIABILITIES TO THE EXTENT OF THE LIQUIDAT-**

---

[5] Laga also had a facility in Asheville, North Carolina, which is occasionally referred to in depositions.

ING DISTRIBUTIONS PAID TO HIM, INCLUDING, IF APPLICABLE, THE VALUE OF ANY WUNDIES STOCK WHICH HE MAY RECEIVE AS A LIQUIDATING DISTRIBUTION.

The Panex shareholders ultimately received three cash liquidation distributions. The first distribution of $6.00 per share occurred on September 21, 1984. The second distribution of $16.00 per share occurred on December 12, 1984. On April 15, 1985, the Certificate of Dissolution of Panex, which had been adopted on September 24, 1984, was filed with the Delaware Secretary of State.

On April 30, 1985, the Panex Board of Directors met and approved an Asset Purchase Agreement negotiated by Rosenbloom (for which First Manhattan Co. received a $500,000.00 fee) to sell substantially all of the assets of Wundies, Inc. to Wundies Industries, Inc. Wundies, Inc. was later sold for $44,320,000.00 in cash and 2,375,000 shares of preferred stock, and 276,105 shares of common stock in Wundies Industries, Inc.

After the sale, the third and final distribution of Panex's assets, including the proceeds of the Wundies, Inc. sale, was made to Panex shareholders. The shareholders received $23.00 per share, as well as one share of preferred stock, and .15 shares of common stock, in Wundies Industries, Inc. for each share held in Panex. *See* Lazare Dep. at 62, 82. The initial balance of the Panex Trust, which was formed on September 12, 1985, was $6 million. The Trust further distributed to its beneficial interest holders (the former Panex shareholders), on July 10, 1987, $3.00 per unit, after which the Trust had a principal balance of $1,150,000.00. The Trust was to terminate after the expiration of Delaware's three-year limitations period for claims against dissolved corporations, but the Trustees elected to continue the Trusts's existence beyond 1988.

By letter dated March 16, 1988 from the New York Department of Environmental Conservation ("DEC"), the Trustees of the Panex Trust received notice that Panex was considered a PRP because of Rochester Button's alleged contamination of the Wellsville-Andover landfill. An additional letter concerning the contamination at the Wellsville facility was sent by the DEC on August 8, 1988.

## C. Procedural Background

In 1989, several groups of plaintiffs filed the first complaints in this case, alleging that the PRPs were responsible for the chemical contamination of the water wells in the Tutu aquifer region. Some of these defendants in turn assumed the roles of third-party plaintiffs and filed third-party complaints against parties known collectively and colloquially as "the Laga defendants" in 1992. They alleged that Laga was responsible, as a result of its on-site dry-cleaning operations, for the contamination of the Tutu aquifer and sought, *inter alia*, CERCLA contribution and cost recovery. Later that year, the Laga defendants moved to dismiss on several grounds, including the dissolved corporations' lack of capacity to be sued. Their motion was granted as to the common law claims (except those against Laga itself), but denied as to the CERCLA claims. *See In re Tutu Wells Contamination Litig.*, 846 F. Supp. 1243, 1283 (D.C.V.I. 1993). In 1993, the parties agreed to sever and stay all CERCLA claims and related discovery until a cleanup remedy could be selected, at which point the parties could better ascertain the potential costs to be recovered under CERCLA. Laga then moved for summary judgment in February 1994 with respect to the common law claims pending against it, asserting that it lacked the capacity to be sued and that there was insufficient evidence that Laga had discharged any contaminants into the Tutu aquifer.

In June 1994, faced with competing and potentially unsatisfiable obligations in this case and in other, unrelated actions, the Trustees filed a petition for instructions in the Delaware Court of Chancery to determine how to allocate the Trust's remaining assets. The Trustees argued that the Court of Chancery was the only forum capable of resolving all of the competing claims against the Trust in a way that would bind all interested parties and thus provide satisfactory protection for the Trustees.

In July of 1994, several defendants moved for a temporary restraining order ("TRO") enjoining the Trust and its Trustees from proceeding with the Delaware petition and from disbursing any Trust assets. These movants feared that the Trust would terminate upon distribution of its last assets and that the former corporations would thereby lose their capacity to be sued before the parties could litigate the severed and stayed CERCLA claims. Some of the Laga defendants opposed the motion on several grounds, asserting

287

that the former corporations already lacked the capacity to be sued and that the Trust and the Trustees were not parties to the lawsuit. The Court granted a TRO in August 1994, but did not enjoin the Trustees from disbursing Trust assets. *See In re Tutu Wells Contamination Litig.*, 157 F.R.D. 367, 379-80 (D.C.V.I. 1994).

The movants in that action filed a motion for permanent injunction in October 1994, seeking only to stay the Delaware petition. Certain of the Laga defendants again opposed the motion on similar grounds as before. In its April 1995 order, the Court stayed the Delaware proceeding and enjoined the disbursement of Trust assets. In July 1995 the Court modified the injunction so that the Trustees could disburse assets from the Trust, but only for certain categories of expenses and only with prior judicial approval. The Trustees were explicitly enjoined from making any disbursement that would deplete fully the Trust's assets, thereby terminating the Trust.

1. The Third Circuit Opinion

The U.S. Court of Appeals for the Third Circuit affirmed this Court's finding that the dissolved corporations had no capacity to be sued on the common law claims. *In re Tutu Wells Contamination Litig.*, No. 95-7280, slip op. at 9 (3d Cir. filed Dec. 21, 1995). The Third Circuit, however, reversed this Court's granting of the injunction and remanded with instructions to dismiss Laga, Duplan and Panex on the ground that they lacked the capacity to be sued, and to dismiss Gal and Lazare, in their capacities as former officers or directors of those three corporations, on the ground that no judgment could be obtained against the dissolved corporations and that therefore no claims could be maintained against their former officers or directors. *Id.* at 17.

The Third Circuit applied V.I. CODE ANN. tit. 13, § 285, which provides for the same three-year limitations period as DEL. CODE ANN. tit. 8, § 278, and opined that Laga has been without capacity to be sued since 1984 (it having been dissolved in 1981). *Id.* at 10-11. The reason for such incapacity was that V.I. CODE ANN. tit. 13, § 344(b), modeled on DEL. CODE ANN. tit. 8, § 325(b), states that "[n]o suit may be brought against any officer, director or stockholder for any debt or liability of a corporation, of which he is an

officer, director or stockholder, until judgment be obtained therefor against the corporation . . . ." *In re Tutu Wells Contamination Litig.*, No. 95-7280, slip op. at 12. Just as common law claims against Duplan and Panex warranted dismissal, so too did those against Laga, and against Gal and Lazare in their capacities as former officers or directors of Laga. *Id.* at 11.

The Third Circuit's most important holding for purposes of this opinion is that as with common law claims, the CERCLA claims against Gal and Lazare in their capacities as former officers and directors of the dissolved corporations also had to be dismissed because no judgment could be obtained against the former corporations. *Id.* at 15.[6] In so doing, the Court of Appeals made a point of discussing a case upon which the parties in the instant dispute rely heavily, *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191 (Del. 1993).

In that case, the Delaware Supreme Court explained what effect the existence of a liquidating trust had on the capacity of a dissolved corporation to be sued under Delaware law. City Investing Company ("City") filed a certificate of dissolution in 1985. In order to achieve significant tax savings by complying with former § 337 of the Internal Revenue Code, City endeavored to distribute all of its assets within one year but was unable to do so. City therefore created a liquidating trust ("City Trust") so that it could take advantage of the tax savings but still keep some money on hand to complete the winding up of the corporation. City Trust explicitly assumed the liabilities of City.

City Trust was set to terminate in 1988, after the three-year winding-up period expired, but City Trust was unable to wind up City's affairs that quickly. Continental Casualty Company ("Continental"), a City creditor, filed a claim against City Trust in 1991. City Trust filed a complaint in Delaware Chancery Court, seeking a declaratory judgment that neither City nor City Trust was liable to suit after the expiration of the three-year period imposed by § 278 of the Delaware General Corporation Law. The Vice Chancellor held that the *corporation* (City) was not amenable to suit after the three-year period had expired. The liquidating *trust* was, on the

---

[6]The full scope of this holding will be discussed *infra* at III, §B(4)(i).

other hand, a separate legal entity capable of being sued because it was not a corporation subject to the limitations imposed by § 278.

The Delaware Supreme Court affirmed. The court explained that the liquidating trust was created for the purpose of achieving tax savings while winding up the affairs of a dissolved corporation. It was a separate legal entity — neither a corporation, nor a business trust, but a simple trust. The trust, therefore, could be sued so long as it existed, and the trust was obligated to discharge all liabilities of the predecessor corporation as provided in the trust agreement. The court stated: "A liquidating trust is formed to wind up the predecessor corporation's affairs and operates in the same manner as a dissolving corporation." *Id.* at 1197 (internal quotation marks omitted). Interpreting *City Investing*, the Third Circuit found that the case also stood for the proposition that a dissolved corporation itself cannot be sued whether or not the trust continues. *Id.* at 15. Moreover, a party cannot sue a dissolved corporation after the three-year period has expired in order to reach the assets of the trust because the dissolved corporation has lost its capacity to be sued. *Id.*[7]

Following the Third Circuit's decision, this Court granted Esso's motion for leave to file an Amended Third-Party Complaint "against the appropriate entities and/or individuals related to the Laga defendants." Mar. 25, 1996 Order. Esso filed its Amended Third-Party Complaint on April 2, 1996 naming Goldman, Sachs; First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom (collectively the "First Manhattan parties"); Andreas Gal and Paul Lazare; Panex Co., and Panex Industries, Inc. Stockholders Liquidating Trust. Esso's Third-Party Amended Complaint was joined by the Texaco parties, Western Auto, and the Virgin Islands Department of Education.[8]

After timely service of the third-party complaints, counsel for third-party defendants Gal, Lazare, Panex Co., and the Panex Trust filed a ·motion to dismiss the third-party complaints and for

---

[7] The Court of Appeals did, however, leave open the possibility of joining the Trustees in the instant litigation under other theories by securing *in personam* jurisdiction over them. *Id.* at 16. Expressing no opinion on these theories' viability, the court anticipated another future application for injunctive relief, *id.*, which was never filed.

[8] L'Henri also filed a complaint but it was never served.

summary judgment. In response, Esso filed its own motion for summary judgment. The parties exchanged responsive pleadings and the Court heard oral argument on these motions in April 1997.

## 2. Activity of Other Courts Affecting this Litigation

Decisions by this and other courts which have come before, and those which have been handed down during the pendency of the these motions, necessarily shape how the Court will reach its decision today. The Court cannot decide the motions in a vacuum based solely on the formal briefs submitted. Fortunately, the parties have not hesitated to apprise the Court of these newly minted decisions by way of informal letter briefs and memoranda. The tenor of these submissions has at times been heated, as the parties have disagreed about the meaning to be attached to these decisions. Therefore, the Court deems it a useful exercise to review these more recent decisions as a means of ascertaining their meaning in the grand scheme of this complex litigation, incorporating additional procedural facts in its discussion.

## 3. The Duplan Bankruptcy Revisited

After service of the third-party complaints in the Spring of 1996, counsel for Goldman, Sachs and the First Manhattan parties entered their appearances and sought extensions of time in which to file responsive pleadings. The parties appeared to reach an agreement on such an extension in anticipation of a management conference scheduled by the Court in the Virgin Islands for July 10, 1996, at which time the agreement was to be memorialized in a court order. But before this occurred, Goldman, Sachs and the First Manhattan parties obtained an Order to Show Cause from the United States District Court for the Southern District of New York. That court required Esso and Texaco to show cause why they should not be enjoined from proceeding against Goldman, Sachs and the First Manhattan parties by reason of the injunction contained in the Final Decree entered in the Duplan bankruptcy proceedings on June 27, 1983.

Nevertheless, Esso negotiated a stipulation and scheduling order regarding the Order to Show Cause with Goldman, Sachs and the First Manhattan parties (both sometimes referred to herein

291

as "Panex distributees") that provided, *inter alia*, that the time for the filing of responsive pleadings to Esso's Amended Third-Party Complaint would be extended until "thirty days after determination of the injunction motion." This order was not entered by the district court in New York, but all parties apparently abided by its terms. This Court accepted the stipulation and did not require responsive pleadings to be filed until the entering of the Fifth Case Management Order ("Fifth CMO"), which ordered that Goldman and the First Manhattan parties "shall have only until July 15, 1997, to file responsive pleadings . . ." (Fifth CMO, June 4, 1997).

The Panex distributees' foray into New York did not prove a fruitful enterprise. On June 11, 1997 Judge Cornelius Blackshear of the Bankruptcy Court for the Southern District of New York concluded that in seeking their *ex parte* order in New York the Panex distributees were "forum-shopping" in the hopes of finding a court that would rule in their favor. *In re The Duplan Corp.*, 1997 WL 324426 at *6 (Bankr. S.D.N.Y. June 11, 1997).[9] Despite the fact that an action was first filed in the Virgin Islands, the bankruptcy court did not abstain from deciding the merits of the Panex distributees' argument that CERCLA claims propounded by the third-party plaintiffs were barred by the 1983 bankruptcy decree. *Id.* "[T]he possibility of inconsistent decisions in the many jurisdictions where Duplan operated manufacturing facilities warrants a final decision by this Court," the court reasoned. *Id.* Moreover, ". . . bankruptcy courts are in the best position to interpret and enforce their own orders." *Id.* (citing cases).

The issue before Judge Blackshear was whether the Final Decree in the 1983 Duplan bankruptcy action discharged the debtors from all of their "debts and liabilities" and whether the Decree would enjoin any suits based upon "any right, claim or interest" against the debtor or Panex by "the Oil Companies" under CERCLA. *Id.* Judge Blackshear noted that the Discharge in the Final Decree only discharged claims that arose "prior to the filing" of the debtor's petition. *Id.* at 8. Since CERCLA claims could not have arisen until 1980, the year of CERCLA's enactment, therefore, these claims were not discharged in bankruptcy. *Id.* at 8-9.

---

[9] This case is currently on appeal.

4. The Delaware Proceedings

In March 1996, the trustees of the Panex Trust filed an Amended and Supplemental Petition for instructions in the Court of Chancery of the State of Delaware. The petitioners sought an order determining, *inter alia*:

(5) That the Trust shall be terminated and the trustees discharged upon compliance with the provisions of the Order of this Court;

(6) That the recipients of distributions from the Trust or from Panex are not liable to the Trust or others for recoupment or reimbursement of their distributions;

(7) That the acts of the company and trustees in making distributions and the anticipated payments hereunder are and were proper in all respects . . . .

(Amended Petition, Exh. A to Lehman Certification).

If the Chancery Court had granted the relief requested, the court would have eliminated any successor entity against which Esso and others could have pursued CERCLA claims. Esso, joined by Texaco, elected to file claims in the Chancery Court seeking a stay of any effort to eliminate the Panex Trust. They further sought an order creating a successor entity against which they could pursue CERCLA claims and the appointment of a new trustee to evaluate and bring recoupment claims to marshal Trust assets.

After two oral arguments, Vice Chancellor Myron T. Steele granted the relief sought by Esso and the Texaco parties, announcing his ruling from the bench on August 27, 1997.[10] The written order reads, in relevant part:

---

[10] This ruling and the Vice Chancellor's order was appealed to the Delaware Supreme Court and dismissed. The court decreed: "The Court of Chancery's September 30 decision clearly is not a final order as it expressly 'retain[s] continuing jurisdiction for the purpose of implementing the terms of [the] Order' and does not finally determine and terminate the proceedings before the Court of Chancery." Dec. 3, 1997 Order at 4. The court also observed that ". . ." [t]he trustees have failed to comply with requirements of SUPREME COURT RULE 42 in seeking to appeal from an interlocutory order. Accordingly, an appeal from the Court of Chancery to this Court is premature, absent compliance with the requirements of RULE 42 or the entry of a final judgment by the Court of Chancery pursuant to RULE 54(b) . . . ." *Id.* at 5. As this Court reads the Order of the Delaware Supreme Court, the Vice Chancellor's determinations remain undisturbed.

. . . [T]he Successor Panex Trust shall be established as a successor entity to the Panex Trust and Panex, Inc. . . .

## 2. *Trust Purpose and Capacity*

a. The purpose and capacity of the Successor Panex Trust is

(1) to serve as the successor entity to the Panex Trust and Panex, Inc. and to succeed to and accept the assets, liabilities, rights, interests, and standing of the Panex Trust and Panex, Inc., except as provided in ¶ 2(b) below;

(2) to serve as the successor entity to the Panex Trust and Panex, Inc. in continuing to litigate, defend against, have judgment entered against it on, and/or settle claims brought against it by Petitioning Claimants in the Environmental Litigations;

(3) to make provision for the payment to the Claimants identified herein for claims arising from liabilities of Panex, Inc. and/or the Panex Trust with respect to the Environmental Litigations, and in furtherance of said purpose, to investigate, evaluate, institute, assert and/or settle litigation at the expense of and on behalf of the Successor Panex Trust against the insurers of Panex, Inc., Duplan Corporation, and/or the Panex Trust; to investigate, evaluate and, if desirable, to institute, assert and/or settle litigation at the expense of and on behalf of the Successor Panex Trust for recoupment of distributions made by Panex, Inc. to its shareholders prior to creation of the Panex Trust in the amount of approximately $64 million, and distributions made by the Panex Trust to the former stockholders of the then dissolved Panex, Inc. in the amount of approximately $4.5 million; to make distribution of any Trust Funds (as defined below) to Claimants as provided for herein; and to make distribution of any Trust Funds unneeded for these purposes to the former stockholders of Panex, Inc. or their successors.

294

b. Notwithstanding the provisions of this paragraph, the Successor Panex Trust is not the successor entity to Panex, Inc. and the Panex Trust regarding any claim against the Successor Panex Trust filed after September 12, 1997, by any entity not already named herein as a Claimant.

(Order of Vice Chancellor Steele, Exh. C to Lehman Certification). The Vice Chancellor appointed Michael DeBaecke, Esquire, a member of the Delaware Bar, as the successor trustee, assuming full authority and responsibility for the Successor Panex Trust. *Id.* He has accepted this assignment.

Further clarifying the proceedings, Vice Chancellor Steele stated from the bench:

The entity that succeeds the current liquidating trust, regardless of how you wish to characterize it, or what appellation you put upon it, will be an entity that for the related CERCLA litigation in whatever jurisdiction will serve as a successor for the purpose of having judgment, if there be one against it, which may be used by the claimants for the purpose of satisfying judgment. That will include whatever appropriate claims or recoupment can be made by way of that vehicle.

Exh. B to Lehman Certification at 4.

Based on the third-party plaintiffs' version of events, the proceedings in Delaware have "resolved a major issue." Esso Br. in Support of Cross-Motion for Voluntary Dismissal ("Esso Br.") at 7. According to the third-party plaintiffs, the order of the Vice Chancellor has created "a successor entity to the Panex Trust against which Esso [and other third-party plaintiffs] can pursue its CERCLA contribution claims in this litigation." *Id.* Hence, third-party plaintiffs have filed a motion for voluntary dismissal. *See* Discussion, *infra*, at II(A).

5. The Buffalo Litigation

At about the same time last year when the bankruptcy action was pending before Judge Blackshear in the Southern District of New York, related litigation against parties named in the third-

295

party complaints in this case was pending on the other side of the state in Buffalo, before Judge Elfvin of the Western District of New York.[11] In that case, captioned *State of New York v. Panex Industries, Inc.,* No. 94-0400E(H) slip. op. filed Oct. 2, 1997 (W.D.N.Y. 1997) (hereinafter *"Panex I"*), plaintiffs alleged CERCLA and common law claims for nuisance and restitution stemming from an alleged dumping of hazardous waste at a landfill in Wellsville, New York between 1964 and 1983. *Id.* at 2. In their amended complaint, plaintiffs argued that First Manhattan Co.; Firmanco Associates; Daniel Rosenbloom; Goldman, Sachs; and Lazare and Gal (collectively "the Panex distributees") are former shareholders of Panex and were thus derivatively liable for whatever judgment might be obtained against Panex or the Panex Trust and that they have received and held distributed assets in trust for the State of New York. *Id.* at 3-4. Defendants, in turn, filed motions pursuant to FED. R. CIV. P. 12(b), asserting plaintiffs had failed to state claims upon which relief could be granted and for lack of subject-matter jurisdiction. *Id.*

Without addressing the applicability of § 325(b) of the ever-present Delaware Code, plaintiffs instead founded their claims against the Panex distributees on the "trust fund doctrine," which provides an equitable claim for creditors of a corporation that is unable to pay its debts because of asset distributions made, without consideration, to shareholders or other third parties. *Id.* at 5. Under this theory, no showing of fraud, unconscionability, or unfairness is required. *Id.* (citing cases).

Judge Elfvin noted that in a previous order of June 21, 1996, he ruled that Panex could be sued under CERCLA because the Act preempts § 278 of the Delaware Code (three-year statutory period in which dissolved corporation has capacity to be sued). *Id.* at 6 n.1. However, the court uncovered no cases applying the plaintiffs'

---

[11] The plaintiffs in that action were the State of New York and Michael Zagata, Commissioner of the New York State Department of Environmental Conservation and Trustee of the Natural Resources. Defendants in that action included other New York parties, but also the parties involved in the case at bar: (1) Panex Industries, Inc.; Panex Industries, Inc. Liquidating Trust; Daniel Rosenbloom and Paul Lazare, as Trustees of Panex Industries, Inc. Liquidating Trust; (2) Paul Lazare; Andreas Gal; Firmanco Associates; Daniel J. Rosenbloom; First Manhattan Co.; and Goldman, Sachs, as distributees of the assets of Panex Industries, Inc.

proffered trust fund doctrine to a dissolved corporation after the expiration of the statutory three-year winding-up period. *Id.* at 7. The Court also noted the older trust fund doctrine had been superseded by state statutes. *Id.* at 7-8 (citing state cases). The court reasoned that allowing the trust fund doctrine to be asserted against shareholders after the expiration of a statutory winding-up period would impermissibly render such subsequent corporate statutes ineffective, allowing dissolved corporations to survive indefinitely through their shareholders. *Id.* at 8. Judge Elfvin thus held that "the trust fund doctrine is inapplicable to a dissolved Delaware corporation subsequent to the three-year period provided in section 278 and that the State's action under CERCLA against the Panex distributees is barred by section 325(b)." *Id.* (footnote omitted). Unlike principles such as alter ego and successor liability (which have been adopted into federal common law), which were created to address abuses of and changes in the corporate form, the trust fund doctrine was instead conceived as a substantive principle of equity much like the doctrines of constructive trust and quasi-contract. *Id.* at 11-12. The Court therefore declined to adopt the trust fund doctrine as federal common law under CERCLA, finding that the doctrine is "no longer . . . settled law in the corporate dissolution setting." *Id.* at 13.

Plaintiffs soon filed a motion for reconsideration of the court's decision. In a recent memorandum decision, Judge Elfvin affirmed his prior ruling. *See State of New York v. Panex Industries, Inc.,* No. 94-0400E(H), slip op. (W.D.N.Y. dated Dec. 30, 1997) (*Panex II*). Plaintiffs asserted that Vice Chancellor Steele's September 30, 1997 order creating successor Panex Trust constituted "new evidence" which would warrant a change or modification of the court's prior opinion and order. *Id.* at 2. The court declined to so hold, noting that "the September 30th Order makes no finding with respect to the substance of the plaintiffs' claims against Panex, the Panex Trust or the Successor Trust." *Id.* at 4.

In *Panex II*, the Western District of New York reiterated its finding that "no trust fund doctrine claim against the Panex distributees would lie under Delaware law." *Id.* at 5. The court found no authority for plaintiffs' proposition that under Delaware law suit may be brought directly against shareholders without first

297

obtaining judgment against the corporation where, as here, a liquidating trust had been formed in order to satisfy claims against the dissolved corporation. *Id.* Furthermore, the court found that, where a liquidating trust has insufficient assets, § 325(b) does not apply, allowing claimants to sue shareholders directly. *Id.* at 5-6.

The court made some final observations. First, the court's June 24, 1996 order simply applied the principle enunciated in *City Investing* that a liquidating trust could be sued after the three-year winding-up period, instead of plaintiffs' reading that the three-year statutory period of § 278 is rendered ineffective or is indefinitely extended whenever a liquidating trust is formed after a corporation's dissolution. *Id.* at 7. Finally, the court interpreted § 278 as barring actions against former shareholders of dissolved corporations after the three-year period. *Id.* Thus, § 278, not preempted by CERCLA, would control. *Id.*

## II. Motions by Third-Party Defendants Goldman, Sachs, First Manhattan, Firmanco Associates, and Rosenbloom for Dismissal for Lack of Jurisdiction and Motions by Third-Party Plaintiffs for Voluntary Dismissal

Since the filing of the first complaints in July 1989, this litigation has taken on a life of its own. It has been characterized by a conundrum of more complaints, amended complaints, discovery and discovery abuses, multiple case management orders, and a series of opinions by the Court. All the while, the Court has attempted to either achieve what has become an illusive global settlement or prepare this case for a final trial at which liability for the Tutu aquifer's contamination and costs for its cleanup would be assessed. Yet even as the Court decides multiple motions to determine which parties will be left standing for the final CERCLA trial in this matter, the saga still appears poised to continue beyond the final resolution of this case. Indeed, this case is akin to the generations-long odyssey in the Chancery Court, *Jarndyce v. Jarndyce,* of *Bleak House* fame:

And thus, through years and years, and lives and lives, everything goes on, constantly beginning over and over again, and nothing ever ends. And we can't get out of the

suit on any terms, for we are made parties to it, and *must be* parties to it, whether we like it or not.[12]

Charles Dickens, Bleak House 146 (Penguin 1971) (emphasis in original). Dickens's lament notwithstanding, the Court address the task at hand: deciding the motions presently before it, taking into account the relevant decisions which have been handed down by other courts during the pendency of these motions. In so doing, the litigation landscape hopefully will be clarified.

The most recent motions in this case are by third-party defendant Goldman, Sachs & Co., joined by third-party defendants First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom (again collectively referred to herein as the "First Manhattan parties"), to dismiss the third-party complaints filed by Esso, Texaco,[13] VIDE, and Western Auto and/or for summary judgment. Counsel for Goldman, Sachs and counsel for the First Manhattan parties, in separate briefs in support of these motions, assert multiple arguments contending that the Court lacks subject matter and personal jurisdiction over the third-party defendants.

Filed with these briefs were supporting affidavits of James B. McHugh and of third-party defendant Daniel Rosenbloom, a general partner of First Manhattan Co.[14] Rosenbloom's affidavit detailed, *inter alia*, the lack of contacts for jurisdictional purposes these particular third-party defendants have with the Virgin Islands. Upon review of the affidavit, the third-party plaintiffs apparently agreed that the Court indeed lacked any kind of jurisdiction over the third-party defendants.[15] In their subsequent reply memoranda, the third-party plaintiffs cross-moved for vol-

---

[12] This passage was also referred to by Senator Pete V. Domenici (R-NM) in describing what it is like to practice CERCLA law. 132 Cong. Rec. 24,730 (1985) (*cited in* Alfred R. Light, Cercla Law and Procedure 11 (BNA Books 1991).

[13] The third-party complaint by "Texaco" was on behalf of Texaco, Inc., Texaco Caribbean, Inc., and Vernon Morgan. The Court will herein refer to these entities collectively as "Texaco." The Court also notes that Vernon Morgan has a motion pending before this Court, substantively unrelated to the motions addressed today, against his insurers. This will be the subject of a forthcoming opinion.

[14] First Manhattan Co., in turn, was the general partner in Firmanco Associates, a New York limited partnership and third-party defendant herein, which was organized in 1981 and dissolved in 1985; its assets were distributed to its partners. Rosenbloom Aff. at 2.

[15] Accordingly, the Court need not reach the merits of the jurisdictional arguments offered by Goldman, Sachs and the First Manhattan parties.

untary dismissal of their claims without prejudice pursuant to Fed. R. Civ. P. 41(a)(2),[16] Esso Br. at 7,[17] which reads, in relevant part:

> By Order of Court. . . . [A]n action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper . . . Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

At oral argument, counsel for Goldman, Sachs stated, on the issue of whether the third-party plaintiffs' claims should be dismissed with or without prejudice: "... I'm going to tell the Court very candidly we don't feel strongly about it . . . It's not a big deal to us." Tr. of Nov. 12, 1997 Hr'g at 8. He further conceded: "If the Court wants to dismiss on a without prejudice basis we really have no objection to that." *Id.* at 8-9. Counsel for the First Manhattan parties joined in this sentiment.[18] The Court, however, must review the standards governing Rule 41(a)(2) dismissal. In so doing, the

---

[16] Esso represents in its brief that it proposed a voluntary dismissal pursuant to Fed. R. Civ. P. 41(a), "but received no response to this offer." Exh. E to Lehman Certification; Esso Br. at 7. Rule 41(a)(2), unlike Rule 41(a)(1), contemplates the Court's granting voluntary dismissal in the exercise of its own discretion as to the conditions to be imposed on such dismissal. Rule 41(a)(1), which is clearly inapplicable to the procedural history of this case, states in pertinent part:

(1) By Plaintiff; by Stipulation. . . . [A]n action may be dismissed by the plaintiff without an order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in this action . . . .

At oral argument, all of the parties agreed that the imposition or non-imposition of costs lies within the Court's discretion and proceeded under the assumption that they were dealing with a situation in which the Court could place conditions on the dismissal. The Court thus agrees that Esso's moving under Rule 41(a)(2) was the proper procedure, and it will treat the third-party plaintiffs' motion as one under Rule 41(a)(2).

[17] While the brief in support of the cross-motion for voluntary dismissal was submitted by Esso, counsel for Esso advised at oral argument on this motion that Texaco, the Virgin Islands Government, and Western Auto have joined in their motion. Tr. of Nov. 12, 1997 Hr'g at 14.

[18] Counsel for the First Manhattan parties, when asked by the Court if she had anything to add to the remarks by counsel for Goldman, Sachs, stated: "Your Honor, I have nothing to add to Mr. Cogan's argument, and I think he presented adequately on behalf of First Manhattan." *Id.* at 11. This stipulation to a "without prejudice" dismissal by counsel for Goldman, Sachs and counsel for the First Manhattan parties constitutes a change from the positions advocated in their briefs, wherein they argued for dismissal "with prejudice."

Court will look to case law mainly from district courts within the Third Circuit, as the Court has uncovered no cases decided by the District Court of the Virgin Islands on the subject.

██ Whether a dismissal should be granted on a RULE 41(a)(2) motion indeed lies within the sound discretion of the district court. *Ferguson v. Eakle*, 492 F.2d 26, 28 (3d Cir. 1974); *Ockert v. Union Barge Line Corp.*, 190 F.2d 303, 304-5 (3d Cir. 1951); 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2364 at 161. The purpose of the RULE is primarily to prevent voluntary dismissals which will prejudice the opposing party, and to permit the court to impose curative conditions to ameliorate such prejudice. *Id.* at 165; *Shulley v. Mileur*, 115 F.R.D. 50, 51 (M.D.Pa. 1987) (quotation marks omitted) (*citing John Evans Sons, Inc., v. Majik-Ironers, Inc.*, 95 F.R.D. 186, 190 (E.D.Pa. 1982). Generally, courts have followed the principle that dismissal should be allowed unless the defendant will suffer some plain legal prejudice other than the mere prospect of a second lawsuit. *See Westinghouse Elec. Corp. v. United Elec. Radio and Mach. Workers of Am.*, 194 F.2d 770, 771 (3d Cir. 1952); *Bosteve Ltd. v. Marauszwki*, 110 F.R.D. 257, 259 (E.D.N.Y. 1986); 9 WRIGHT & MILLER, § 2365 at 165. In addressing a RULE 41(A)(2) motion, a court must weigh the relevant equities and do justice between the parties in each case. *Pouls v. Mills*, 1993 WL 308645, *2 (E.D. Pa. 1993), *aff'd*, 27 F.3d 558 (3d Cir. 1994) (citation and quotation marks omitted).

The apparent spirit of cooperation exhibited among the parties in calling for voluntary dismissal, however, is little more than a mirage. This is because, as third-party plaintiffs and third-party defendants well understand, any financial prejudice to third-party defendants can be alleviated by conditioning a voluntary dismissal on the payment of appropriate costs. *Citizens Sav.*, 120 F.R.D. at 26; *Louis*, 92 F.R.D. at 461. As stated by Esso's counsel, the "real issue" now is whether costs should be awarded against the third-party plaintiffs. Tr. at 19.[19] The "costs," characterized as "fees," Tr. at 21,

---

[19] Esso, indeed, has pointed out that "it will under no circumstances consent to a dismissal with costs." Esso Reply Br. at 10. "Unless the present requests for costs are withdrawn, Esso will not consent to this dismissal and will pursue discovery." *Id.* at 2. This, of course, raises a conceptual distinction. The Court therefore cannot simply grant the parties a voluntary dismissal, and then proceed to determine whether or not to assess against Esso and the other third-party plaintiffs costs to be paid to the third-party

should not be awarded, argue third-party plaintiffs, because if third-party defendants wanted to raise the jurisdictional arguments they now proffer, they could have made a motion — "a very simple application" — much earlier. *Id.* at 21-2. As such, any costs incurred "are the result[] of self-inflicted wounds." *Id.* at 21. Goldman, Sachs and the First Manhattan parties counter that the Court, in its discretion, should award costs in connection with the defense of the third-party complaints which were devoid of merit due to jurisdictional infirmities. *Id.* at 8-9.[20] They assert that the third-party defendants' insufficiency of contacts with the Virgin Islands[21] would have been evident had the third-party plaintiffs made even "the most rudimentary investigation." *Id.* at 23. Despite their recognition that they could have been sued instead in New York, counsel for third-party defendants claim that they were required to read multiple opinions and numerous documents because they were unexpectedly made parties to this litigation in the Virgin Islands. *Id.*

■ There is no question that RULE 41(a)(2) authorizes a court to award costs and attorney fees as a condition of voluntary dismissal, and numerous courts have done so where a voluntary dismissal has been granted without prejudice. *John Evans Sons, Inc. v. Majik-Ironers, Inc.*, 95 F.R.D. 186, 191 (E.D. Pa. 1982) (*citing* 9 WRIGHT & MILLER, § 2366; 5 MOORE'S FEDERAL PRACTICE, ¶ 41.06 and cases cited therein). Ordinarily, the purpose of the awards in such cases is to compensate the defendant for having incurred the expense of trial preparation without the benefit of a final determi-

---

defendants. Rather, the Court must determine first whether to award costs, and then, and only then, accede to the parties' request for voluntary dismissal without prejudice under RULE 41(a)(2).

[20] Third-party defendants noted at oral argument that they do not seek costs against putative third-party plaintiff L'Henri and parties collectively referred to as the "Francois defendants," in recognition of the fact that although these parties filed complaints, they were never served. Tr. at 29. For the remainder of this opinion, however, the Court will address L'Henri in conjunction with other third-party plaintiffs for the sake of ease, and as the briefs in this case also allude to L'Henri.

[21] In a previous opinion the Court found personal jurisdiction to exist over Daniel Rosenbloom in the Virgin Islands in his capacity as a Trustee to the Panex Trust. *In re Tutu Wells Contamination Litig.*, 157 F.R.D. 367, 375 (D.C.V.I. 1994). Esso asserts that the dismissal of Daniel Rosenbloom discussed herein would extend to his capacity as a principal of First Manhattan and Firmanco. Esso Br. in Support of Cross-motion for Voluntary Dismissal at 10.

nation of the controversy. *Id.; see also Cone v. West Virginia Paper Co.,* 330 U.S. 212 (1947) (plaintiff traditionally has an unqualified right upon payment of costs to take a nonsuit in order to file a new action after further preparation unless defendant would suffer some plain legal prejudice other than the mere prospect of a second lawsuit).

Since the issue of whether voluntary dismissal in this case will be with or without prejudice is not a cause for significant dispute, the Court must now look at the facts of this case and determine the appropriateness of an award of costs to the third-party defendants. Then and only then can the Court find that third-party plaintiffs' cross-motion for voluntary dismissal under FED. R. CIV. P. 41(a)(2) should be granted.

■ Courts will generally consider as factors in determining the appropriateness of an award of costs and attorney fees to a defendant: (1) any excessive and duplicative expense of a second litigation; (2) the effort and expense incurred by a defendant in preparing for trial; (3) the extent to which the pending litigation has progressed; (4) and the claimant's diligence in moving to dismiss. *Citizens Sav. Ass'n v. Franciscus,* 120 F.R.D. 22, 25 (M.D. Pa. 1988). That the pending litigation is at an advanced stage, however, does not preclude a dismissal.[22]

■ While the award of costs and fees is often necessary for the protection of the defendant, *Puerto Rico Maritime Shipping Auth. v. Leith,* 668 F.2d 46, 51 (1st Cir. 1981), and it may be commonplace, *Shulley,* 115 F.R.D. at 52 (*citing Pittsburgh Jaycees v. United States Jaycees,* 89 F.R.D. 454 (W.D. Pa. 1981), it is not always a prerequisite for voluntary dismissal. After careful review of the background and posture of this ongoing litigation, the Court in its discretion

---

[22] *Holiday Queen Land Corp. v. Bakker,* 489 F.2d 1031, 1032 (5th Cir. 1974) (abuse of discretion to deny voluntary dismissal motion made within ten days of trial where defendant would not lose any "substantial right"); *Citizens Sav.,* 120 F.R.D. at 24 (dismissal allowed after extensive discovery concluded and case scheduled for trial); *B & J Manuf. Co. v. D.A. Frost Indus., Inc.,* 106 F.R.D. 351, 353 (N.D. Ohio 1985) (dismissal granted after considerable discovery and trial preparation); *Louis v. Bache Group, Inc.,* 92 F.R.D. 459, 461 (S.D.N.Y. 1981) (dismissal granted after summary judgment motion briefed and case ready for trial); *Spencer v. Moore Bus. Forms, Inc.,* 87 F.R.D. 118, 120 (N.D. Ga. 1980) (dismissal granted after "exhaustive discovery" and adjudication of numerous motions" in case pending over four years).

concludes that an award of costs to these third-party defendants is not appropriate. Clearly, by dismissing this action under Rule 41(a)(2), Goldman, Sachs and the First Manhattan parties will suffer no plain legal prejudice other than the mere prospect of a second lawsuit, which, standing alone, is not dispositive.[23] As counsel for Esso noted at oral argument, "We could have gone to New York and sued them." Tr. at 22. In that case, third-party plaintiffs clearly would have had much stronger jurisdictional arguments. Thus, third-party defendants would have been required to prepare to defend their clients and read roughly the same amount of material to get up to speed on the issues in this case and properly advise their clients on the appropriate litigation strategy. The Court can only speculate[24] as to what the costs would have been — whether they would have been lesser or greater. Nonetheless, the third-party defendants would have had to do no duplicative or excessive work. The forum would have been either in the Virgin Islands or in New York.

█ This is also not a case where third-party defendants had to prepare for trial and were deprived of the benefit of a final determination of the controversy. This case will most likely not be

---

[23] Indeed, it is apparent from the comments of counsel for third-party defendants at oral argument that a second lawsuit based on the causes of action which are stated in the present third-party complaints is, in fact, a mere prospect. Counsel for Goldman, Sachs, in conceding that a dismissal either with or without prejudice is acceptable, stated:

"But I want to be very candid with the Court. It's not a big deal to us. There is a successor trustee. If the Court wants to dismiss on a without prejudice basis we really have no objection to that. *We are confident that he will vigorously defend the trust as his predecessor trustee did, and we're confident that he will not bring frivolous causes of action against Goldman Sachs or First Manhattan that would expose him to liability for breaching his fiduciary duty to those beneficiaries.* So if Your Honor wants to dismiss on a without prejudice basis, we'll be happy to deal with the successor trustee on that issue (emphasis added)." (Tr. at 8-9).

Similarly, counsel for the First Manhattan parties also opined that she did not expect the trustee to file a second lawsuit:

"I think it's rather presumptuous at this point to assume that Mr. DeBaecke will conclude differently from Judge Elfvin [in the Western District of New York] [and] . . . the Third Circuit that there is, in fact, some cause of action he can and should pursue. I would say only that Mr. DeBaecke has been given certain fiduciary duties and I [am] sure he will discharge those duties in the most competent and ethical fashion." (Tr. at 24).

[24] Similarly, counsel for the First Manhattan parties could only speculate on what the costs were in defense of the third-party complaints. Tr. at 30-31.

ready for trial in the immediate future due to what will surely be an extended period of discovery. Thus, there are no typical RULE 41 concerns about forcing an unwilling party to prepare for trial. Significantly, the third-party defendants have only been parties to this litigation since April of 1996. Compared to other, more war-weary veterans of this litigation, they are certainly newcomers who are not in the late stages of this case. Moreover, dismissal of the third-party complaints gives to Goldman, Sachs and the First Manhattan parties what they anticipate to be a final determination in this controversy.

■ Goldman, Sachs and the First Manhattan parties were also not passive litigants that were forced to do wholly unnecessary work in the Virgin Islands case. Instead, they took the offensive and incurred costs by filing an action in U.S. Bankruptcy Court in the Southern District of New York, seeking a determination that third-party plaintiffs' CERCLA claims were extinguished by the Duplan bankruptcy determination.[25] Had third-party plaintiffs made good on their intention to alternatively bring suit against them in New York, seeking relief in the bankruptcy court also would have been a viable option for Goldman, Sachs and the First Manhattan parties. Moreover, once it became apparent that the third-party defendants were being "dragged" into this litigation, Tr. at 9, a natural and typical strategic defense posture for an unwitting defendant would have been to file a motion to dismiss for lack of personal jurisdiction. Information supporting this motion could have been obtained by counsel by conferring with their clients at a much earlier date — before they were required to review seven years of documents in a complex environmental contamination file. Reply Br. of Western Auto in Support of Cross-Motion for Voluntary Dismissal at 6 n.2. In all likelihood, the nature of the contacts Goldman, Sachs and the First Manhattan parties had with the Virgin Islands are no different now with the submission of the affidavits than they were many months ago

---

[25] As noted above, Goldman, Sachs and the First Manhattan parties were unsuccessful in this endeavor, as Judge Blackshear concluded, *inter alia*, that CERCLA claims were not discharged by the Duplan Corporation's 1981 bankruptcy. *In re The Duplan Corporation*, 1997 WL 324426 *8-9 (Bankr. S.D.N.Y. June 11, 1997).

when the third-party complaints were first filed. Assuming that what these affidavits say is true — and the Court has no reason to doubt their veracity — third-party defendants' jurisdictional arguments are simple and straightforward.

As counsel for Western Auto correctly points out, legal work done by these third-party defendants on issues which did not affect the motions on jurisdictional issues, and which were not in response to any discovery propounded on these parties, would never have been necessary if the third-party defendants had immediately moved on their jurisdictional arguments. *Id.* While it is unclear at this point whether the Successor Trustee will move against Goldman, Sachs and the First Manhattan parties with claims similar to those pled in the instant action, some of the same arguments, which are well-developed and fully set forth in their initial briefs, may be used in defense of such an action. Additionally, these arguments overlap with the third-party defendants' theories necessary in defending their clients in the lawsuit filed in the Western District of New York.

Bound up with a consideration of the third-party defendants' diligence in making their jurisdictional arguments is an understanding of what occurred procedurally in this case. The third-party complaints were filed in the Spring of 1996. After they were served, Goldman, Sachs and the First Manhattan parties sought from third-party plaintiffs an extension of time in which to file their responsive papers. The two sides, in anticipation of a case management conference scheduled by the Court for July 10, 1996, apparently agreed on this extension and hoped to memorialize this agreement in an order. Yet before this could be done, the third-party defendants sought and obtained their order to show cause from the bankruptcy court. This proceeding, as pointed out by counsel for Texaco, was for all intents and purposes one which went substantively to the merits and viability of the third-party plaintiffs' CERCLA and RCRA claims. Tr. at 31. These same issues are argued in these third-party defendants' briefs in support of dismissal for lack of personal jurisdiction or alternatively for summary judgment. For whatever reason, it appears that they interposed their jurisdictional arguments, though in compliance with the Court's briefing schedule, only after they failed to have

the instant third-party claims substantively thrown out in another forum.

Given the lack of a serious dispute as to the form of the dismissal, the Court will accommodate the parties and dismiss the third-party complaints against Goldman, Sachs and the First Manhattan parties without prejudice pursuant to Fed. R. Civ. P. 41(a)(2). And having applied the four factors set forth in *Citizens Sav. Ass'n* to the procedural facts and history of this case, the Court in its discretion concludes that Goldman, Sachs and the First Manhattan parties will not be sufficiently prejudiced by this voluntary dismissal to warrant an award of costs and fees as a condition thereto.

### III. Motions of Gal, Lazare, Panex Co., and Panex Trust for 12(b)(6) Dismissal and Summary Judgment and Third-Party Plaintiffs' Motions for Summary Judgment

*A. Introduction*

Following the Third Circuit's decision in this case, this Court granted certain of the parties to this litigation leave to file third-party complaints. The Court will set forth the allegations contained therein.

Third-party plaintiffs Esso Virgin Islands, Inc. and Esso Standard Oil Co. (P.R.) (collectively referred to singularly hereinafter as "Esso") have brought several claims against third-party defendants Andreas Gal, Paul Lazare, Panex Co., and Panex Industries, Inc. Stockholders Liquidating Trust ("the Panex Trust").[26] Esso first contends that these third-party defendants (sometimes the "Laga defendants") are strictly and jointly and severally liable to Esso under § 107(a)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607(a)(2)(B),[27] for all necessary response costs Esso has incurred and will incur as part of its own remediation of the Tutu Wells site.

---

[26] Goldman, Sachs and the First Manhattan parties were, of course, named in the third-party complaints in this action. Third-party plaintiffs' motion for voluntary dismissal, and the Court's granting of that motion, obviates the need to include them in this discussion.

[27] Under the heading of "Claim Under CERCLA § 107(a)(1)," Esso never mentions (a)(1) specifically, but instead refers to (a)(2).

First Amended Third-Party Complaint of Esso ("Esso Compl.") at Count I, ¶ 64. Moreover, certain of the remaining third-party defendants, "as distributees of the assets of Panex and the Panex Trust, are derivatively liable for the CERCLA claims of Esso, hold such distributions in equitable trust for the creditors of Panex, including Esso, and are liable to the extent of such distributions for Esso's claims . . . pursuant to the terms and conditions of such distributions and the equitable doctrines of recoupment and restitution." *Id.* at Count I, ¶ 65. In Count II of its Complaint, Esso brings another claim for response costs, coupled with the same derivative liability and equitable theories, under § 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3)(B). *Id.* at Count II, ¶¶ 66-73. Next, Esso pleads a claim for contribution under § 113(f)(1), 42 U.S.C. § 9613(f)(1) for past and future response costs, coupled with its derivative liability and equitable theories. *Id.* at Count III, ¶¶ 74-83. In Count IV, Esso seeks "declaratory judgment pursuant to § 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201(a) as to the rights and duties of the parties and, in particular, a determination that the third-party defendants are liable to Esso under § 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1) for contribution of all response costs incurred by Esso with respect to the Laga facility and Tutu Wells facility, including but not limited to, costs of contamination assessment, containment, removal, remediation, EPA administrative or oversight and/or attorneys fees and costs." *Id.* at Count IV, ¶ 90. Under Count IV, Esso also seeks declaratory judgment that its CERCLA claims may be enforced against the Laga defendants to the extent that any of them received distributions from the assets of Panex Co. and Panex Trust under derivative liability and equitable theories. *Id.* at ¶ 91. Finally, Esso brings claims under §§ 7002 and 7003 of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. §§ 6972 and 6973, to abate imminent and substantial endangerment to the health and environment of the affected area. *Id.* at Count V, ¶¶ 92-97.

The third-party complaint on behalf of Texaco alleges, under the guise of "Count I," joint and several and strict liability under § 107 (without specifying which subdivision); contribution under § 113(f); "contribution liability" under § 113(g)(2); and declaratory

judgment pursuant to 28 U.S.C. § 2201(a). Texaco Compl., Count I, ¶¶ 43-55. Next, and again without mentioning which sections, Texaco alleges a claim under RCRA, seemingly styled after Esso's claim under §§ 7002 and 7003. *Id.* at Count II, ¶¶ 56-61. Texaco finally alleges common-law causes of action under strict liability, Count III, ¶¶ 62-67, and equitable disgorgement, Count IV, ¶¶ 68-71.

The third-party complaint of VIDE, the current owner of the old Laga facility, almost precisely tracks Texaco's complaint. Similarly, the third-party complaint of L'Henri, which was filed but never served, also alleges CERCLA claims under § 107(a)(2), § 107(a)(3), § 113(f)(1), § 113(g)(2) and 28 U.S.C. § 2201(a), and RCRA §§ 7002 and 7003. Finally, Western Auto alleges a generalized CERCLA cause of action which mentions § 107, § 113(f), § 113(g)(2) and 28 U.S.C. § 2201(a); a RCRA count; and common-law claims of strict liability (Count III) and equitable disgorgement (Count IV).

In response to the third-party complaints the Laga defendants have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted and for summary judgment under Fed. R. Civ. P. 56. Br. in Support of Dismissal and Summ. J. ("Panex Br.") at 1. Esso, in turn, filed its own summary judgment motion as to the individual liabilities of Gal and Lazare. In support of these motions, both sides have submitted numerous affidavits, results of investigations, documents of title, stacks of transcripts, and countless other items for the Court's consideration. In moving for dismissal pursuant to Rule 12(b)(6) and alternatively for summary judgment under Rule 56(c), the Laga defendants have submitted so much supplemental material, and so enmeshed their legal arguments with their factual arguments, that the Court has had no choice but to review it.

■ Fed. R. Civ. P. 12(b) provides that if, on a motion to dismiss under Rule 12(b)(6),

> matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

*See also* 5A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366 at 493 (noting that "[o]nce the court decides to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment"). It is, however, also well established that prior to converting a motion to dismiss into a motion for summary judgment, the district court must provide adequate notice to the parties. *Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989); *see also* 5A WRIGHT & MILLER, *supra*, § 1366 at 501 ("It is important that the court give the parties notice of the changed status of the motion and a 'reasonable opportunity to present all material made pertinent to such a motion by RULE 56'"). "Certainly, the nonmoving party must have adequate notice and time to present to the district court material relevant to [its] claim in order to demonstrate that there is a genuine issue of material fact that renders summary disposition of the case inappropriate." *Hilfirty v. Shipman*, 91 F.3d 573, 578 (3d Cir. 1996).

 The Court finds that the parties in this litigation had adequate notice that a conversion from RULE 12(b)(6) to RULE 56(c) might have occurred. These motions have been pending for some time; they were last argued back in April of 1997. The Court has long accepted without objection all of the parties' supporting materials, and the parties have not hesitated to provide the Court with just about every piece of material outside of the pleadings they could uncover. No party has objected to what has become a veritable free-for-all of submissions outside of the pleadings. In addition, Esso has filed its own summary judgment motion. Two out of three motions now before the Court are thus motions for summary judgment. The Court concludes that the parties indeed had adequate notice and will therefore treat the motions before it, with their attendant legal arguments, as cross-motions for summary judgment.

 Summary judgment is appropriately granted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (*cited in Hilfirty*, 91 F.3d at 577). If, however, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), summary

310

judgment shall not be granted. The nonmoving party is entitled to have all reasonable inferences drawn in its favor. *Hilfirty*, 91 F.3d at 577 (citation omitted).

*B. Third-Party Defendants' Motion for Summary Judgment*

1. Viability of RCRA Claims

Before addressing the viability of the third-party plaintiffs' CERCLA claims, and third-party defendants' arguments in support of summary judgment, the Court will address the viability of third-party plaintiffs' claims under §§ 7002 and 7003, 42 U.S.C. §§ 6972 and 6973 of RCRA.

The complaints of third-party plaintiffs all state similar RCRA claims. First, they contend that chemicals and/or residue from the former Laga plant's dry cleaning operations stored or disposed of constitute "solid" and/or "hazardous waste" within the meaning of 40 C.F.R. §§ 261.2 and 261.3. Second, they argue that Panex Co., Panex, Industries, Inc., Gal and Lazare contributed to the storage or disposal of this hazardous waste, which presents an imminent and substantial endangerment to human health and the environment. Third-party plaintiffs further assert that EPA, DPNR, Panex Co., Panex Industries, Inc. and its predecessors, the Panex Trust, Gal and Lazare have had notice of this endangerment for more than ninety days. Additionally, they contend that the Panex Trust is the successor to RCRA liabilities of Laga, Duplan and Panex Industries, Inc. arising from the storage and/or disposal of the chemicals. Finally, third-party plaintiffs contend that Gal and Lazare are liable to them to the extent that they received distributions of assets of the Panex Trust, which assets are held "in equitable trust for the creditors of Panex" pursuant to the terms and conditions of those distributions and the equitable doctrines of recoupment and restitution.

In response, third-party defendants claim that these RCRA claims are barred by *Meghrig v. KFC Western, Inc.*, 116 S.Ct. 1251 (1996) to the extent third-party plaintiffs seek to recover response costs incurred or yet to be incurred for remediation of the Tutu aquifer. Panex Br. at 89. In *Meghrig*, the Supreme Court held that RCRA § 7002, 42 U.S.C. § 6972, the "citizen suit" provision, does not authorize a private cause of action to recover the prior costs of

cleaning up toxic waste that does not, at the time of suit, continue to pose an endangerment to health or the environment. *Id.* at 1253. The Laga defendants contend that § 6972(a) precludes third-party plaintiffs from recovering response costs because, as stated by the *Meghrig* court, RCRA does not authorize such relief:

> It is apparent from the two remedies described in § 6972(a) that RCRA's citizen suit provision is not directed at providing compensation for past cleanup efforts. Under a plain reading of this remedial scheme, a private citizen suing under § 6972(a)(1)(B) could seek a mandatory injunction, i.e., one that orders a responsible party to "take action" by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, i.e., one that "restrains" a responsible party from further violating RCRA. Neither remedy, however, . . . contemplates the award of past cleanup costs, whether these are denominated "damages" or "equitable restitution."

*Meghrig*, 116 S.Ct. at 1254. Third-party plaintiffs Esso, Texaco, and L'Henri respond that they are, in fact, seeking injunctive relief. While not specifically pled under the RCRA subheadings in their complaints, statements that third-party plaintiffs seek "an order that the third-party defendants perform the cleanup of the Laga Facility and the Tutu Wellfield Site," is mentioned in the "prayer for relief" sections of these complaints, along with demands for monetary damages.[28]

██ Whether third-party plaintiffs are barred from seeking past and future response costs under RCRA and limited to injunctive relief under *Meghrig,* however, is an issue the Court need not reach. Third-party plaintiffs are barred from bringing any suit at all under

---

[28]Texaco Compl. at 15. The Court cites Texaco's complaint as an example of the parties' pleadings, as it is representative of the other third-party complaints. Esso's third-party complaint is more specific in that Esso seeks an injunction ordering third-party defendants "to perform a cleanup of the Laga facility and the Tutu Wellfield facility and to abate the imminent endangerment caused by the releases of hazardous wastes from the Laga facility." Esso Compl. at 21. Suffice it to say, in one form or another third-party plaintiffs do ask for some form of injunctive relief, along with response costs.

312

RCRA for other, more fundamental, reasons:[29] statutory construction and the current factual realities in this case.

Without any kind of specificity as to the appropriate subsection, third party plaintiffs bring this action under § 6972. Giving the third-party complaints a generous reading, the Court can nevertheless surmise that these RCRA claims are brought pursuant to § 7002, 42 U.S.C. § 6972(a)(1)(B), which provides, in relevant part:

> *Except as provided in subsection (b) or (c) of this section,* any person may commence a civil action on his own behalf —
>
> (1)(B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

42 U.S.C. § 6972(a)(1)(B) (emphasis added). 42 U.S.C. § 6972(b)(1)(B), however, bars the instant third-party claims under RCRA. That provision reads, in pertinent part:

> *No action may be commenced under subsection (a)(1)(B) of this section if the Administrator,* in order to restrain or abate acts

---

[29] Certain of the third-party plaintiffs cite other RCRA provisions, such as §§ 6971 and 6973, in addition to the citizen suit provision of § 6972(a). These parties allege no facts in their complaints which would support these provisions. Moreover, the fact that several parties pled these two other provisions and that they are not even close to being related to this litigation suggests that the parties merely copied off one another. Section 6971, for example, deals with employee protection against discrimination in the workplace. *See* 42 U.S.C. § 6971. Section 7003, 42 U.S.C. § 6973, also just mentioned in the complaints, deals with the *authority of an Administrator* to bring suit on behalf of the United States "upon receipt of evidence that the past or present handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment . . ." Plaintiffs' citation to this particular statutory provision is inapposite. None of the third-party plaintiffs qualify as "an Administrator." Therefore, to the extent third-party plaintiffs cite to, or bring claims under, §§ 6971 and 6973, they are dismissed with prejudice.

of conditions which may have contributed or are contributing to the activities which may present the alleged endangerment —

(i) has commenced and is diligently prosecuting an action under section 6973 of this title or under section 106 of [CERCLA] . . .;

(ii) is actually engaging in a removal action under section 104 of [CERCLA];

(iii) has incurred costs to initiate a Remedial Investigation and Feasibility Study under section 104 of [CERCLA] and is diligently proceeding with a remedial action under that Act . . .; or

(iv) has obtained a court order (including a consent decree) *or issued an administrative order under section 106 of [CERCLA] or section 6973 of this title pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action.*

42 U.S.C. § 6972(b)(1)(B). Under the plain language of this statute, third-party plaintiffs are barred from proceeding under RCRA for different reasons. Esso, Texaco, and L'Henri may not proceed under RCRA because, as provided in § 6972(b)(1)(B)(iv), the EPA did issue a Unilateral Administrative Order of Consent (AOC) under, *inter alia*, § 106 of CERCLA against these particular parties. *See* Mar. 22, 1990 AOC at 1. Certain third-party plaintiffs admit in their own complaints that this is the case and that they have complied with such orders. Esso states:

43. On March 22, 1990, the EPA issued a Unilateral Administrative Order ("UAO") to Esso and others under the provisions of RCRA and CERCLA requiring, inter alia, the implementation of a well monitoring program at the Tutu Wells Site. Esso has implemented and fulfilled the requirements of the UAO in a manner consistent with the National Contingency Plan ("NCP").

314

44. In February 1992, the EPA entered an Administrative Order of Consent ("ACO") with Esso and others, under the provisions of RCRA and CERCLA requiring, among other things, that Esso undertake a Remedial Investigation/Feasibility Study ("RI/FS") for the Tutu Wells Site. Esso has implemented and fulfilled the requirements of the ACO in a manner consistent with the NCP.

Esso Compl. at ¶¶ 42-43. Texaco has almost identical paragraphs in its third-party complaint, (Texaco Compl. at ¶¶ 37-38), as does L'Henri (L'Henri Compl. at ¶¶ 43-44). Moreover, the Court has learned in recent weeks that the cleanup of the aquifer is poised to commence.[30] Thus, third-party plaintiffs cannot evade the reach of § 6972(b)(1)(B)(iv) because their admissions in their complaints and their own subsequent actions constitute diligent compliance with the administrative orders issued by the EPA. Accordingly, third-party defendants are entitled to summary judgment as to the RCRA claims of Esso, Texaco (and L'Henri).

VIDE and Western Auto are also prevented from seeking injunctive and declaratory relief against the Laga defendants for the abatement of an imminent endangerment caused by hazardous wastes at the old Laga facility. They are barred from proceeding under RCRA based on the same subsection, § 6972 (b)(1)(B)(iv), but for a different reason. While Esso, Texaco, and L'Henri cannot proceed because they were subject to administrative orders issued by the EPA and because they (Esso and Texaco) took it upon themselves to diligently undertake the cleanup, the plain terms of the statute say nothing limiting its reach only to those parties against whom administrative orders are issued and who themselves undertake the cleanup. Section 6972(b)(1)(B)(iv) only states

---

[30] On the eve of the issuance of this decision, the Court received motion papers pertaining to DPNR's revocation of Texaco's permits to begin site remediation. This matter was the subject of a January 9, 1998 conference call, during which Addison Meyers, Esquire, counsel for Texaco, represented that there are workers and equipment already on site prepared to begin remediation. The case is captioned *Texaco Caribbean, Inc. v. Beulah Dalmida-Smith and Government of the Virgin Islands, Dep't of Planning and Natural Resources*, Civ. No. 98-28, and movant's motion packet includes a complaint; affidavits and exhibits; a proposed order to show cause (which the Court entered on February 5, 1998) with a corresponding memorandum of law in support of plaintiff's motion for preliminary injunction; and plaintiff's motion to consolidate.

315

that private parties are barred from bringing a RCRA action where an Administration has ". . . *issued an administrative order under section 106* of [CERCLA] or section 6973 of this title pursuant to which *a responsible party* is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action (emphasis added)." Western Auto's and VIDE's (and L'Henri's) ability to maintain an action under RCRA, therefore, is undercut by the very fact that other parties — Esso and Texaco — are complying with the EPA administrative orders. Practically speaking, and looking to what is happening on the ground at the contaminated site, it would be nonsensical for the Court to now foist the duty of remediating the site on the Laga defendants when two major oil companies are prepared — in varying degrees — to implement their own remediation programs. Based on Texaco's representations made during a January 9, 1998 conference call, Texaco already has people and equipment on the ground and an expensive system designed to begin the necessary work of seeing to it that the Tutu aquifer is cleaned up. Forcing another party — such as the Laga defendants — to start from scratch to pay for and design a remediation program would be an unintended result which appears to have been contemplated by the prohibitions of § 6972(b)(1)(B)(iv). Congress could not have intended such a result.

Accordingly, just as Esso, Texaco, and L'Henri are precluded from bringing claims under RCRA, so too are Western Auto and VIDE. As the third-party defendants are entitled to judgment as a matter of law, the Court will grant their motion for summary judgment as to all RCRA claims against them. These claims will be dismissed with prejudice.

2. Retroactivity of CERCLA

■ Relying almost solely on *United States v. Olin Corp.*, 927 F. Supp. 1502 (S.D.Ala. 1996), the third-party defendants assert that the legislative history of CERCLA suggests that the statute was not intended to apply retroactively. Panex Br. at 92. Therefore, CERCLA claims should not apply to conduct at the Laga textile plant site which ended before the enactment of the statute in 1980. *Id.* at 93. Not only has this district court case been reversed by

*United States v. Olin Corp.*, 107 F.3d 1506 (11th Cir. 1997) during the pendency of these motions, but our courts have held that CERCLA applies retroactively. *Gould, Inc. v. A & M Battery & Tire Serv.*, 933 F. Supp. 431, 438 (M.D. Pa. 1996); *In the Matter of Penn Central*, 944 F.2d 164 (3d Cir. 1991). Third-party defendants' claim is without merit, cannot serve as a basis for summary judgment, and warrants no further discussion.

### 3. CERCLA § 107 v. § 113

 In response to a 1990 EPA Unilateral Administrative Order, Esso, Texaco, L'Henri, VIDE, and Western Auto, among others, were required to implement a well monitoring program at the Tutu Wells site. The EPA's issuance of this mandate was pursuant to that agency's naming these parties PRPs for the site contamination. Record of Decision ("ROD") at 2-3. Specifically, the EPA required the PRPs to undertake a Remedial Investigation/Feasibility Study ("RI/FS"). A threshold issue now before the Court is whether third-party plaintiffs can maintain CERLCA claims for cost recovery of past and future response costs under § 107 alongside CERLCA claims under § 113 for contribution. The Laga defendants claim that third-party plaintiffs, given the factual background and procedural posture of this case, cannot bring these claims together. Having reviewed applicable Third Circuit precedent, the Court holds that the third-party plaintiffs in this case are not limited to simply bringing a contribution claim under § 113 and that § 113 and § 107 claims under CERCLA both remain viable.[31]

CERCLA and the Superfund Amendments and Reauthorization Act of 1986 ("SARA") together create two different kinds of legal actions by which parties can recoup some or all of the costs associated with clean-ups: § 107 cost recovery actions, *see* 42 U.S.C. § 9607(a), and § 113 contributions actions, *see id.* § 9613(f)(1). Section 107 of CERCLA provides that certain enumerated parties called "potentially responsible persons"

---

[31] This determination is preliminary, subject to the Court's addressing the third-party defendants' other arguments in support of summary judgment.

shall be liable for . . . all costs of removal or remedial action incurred by the United States Government . . .; [and] any other necessary costs of response incurred by any other person consistent with the national contingency plan[32] . . . . *Id.* § 9613(g)(2).

The term "potentially responsible persons" describes four classes of persons defined in CERCLA § 107(a): the current owner or operator of a facility, 42 U.S.C. § 9607(a)(1); any person who owned or operated the facility "at the time of disposal of any hazardous substance," *id.* § 9607(a)(2); any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at the facility, *id.* § 9607(a)(3); and any person who accepts or accepted hazardous substances for transport to sites selected by such person, *id.* § 9607(a)(4).[33] Third-party plaintiffs have proceeded under § 107(a)(2), 42 U.S.C. § 9607(a)(2), and § 107(a)(3), 42 U.S.C. § 9607(a)(3). Section 113 of SARA provides, by contrast, that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [§ 107], during or following any civil action under [§ 107]. 42 U.S.C. § 9613(f)(1). The key issue, as third-party defendants assert, is whether a § 107 suit may be brought simultaneously with a § 113 suit and which statutory provision more accurately characterizes the relief sought by third-party plaintiffs.

■ Every court of appeals that has examined this question has come to the same conclusion: a § 107 action brought for recovery of costs may be brought only by "innocent" parties that have undertaken cleanups. *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1120 (3d Cir. 1997). An action brought by a potentially responsible person is by necessity a § 113 action for contribution. *Id.* (*citing Redwing Carriers, Inc. v. Saraland Apartments*, 94

---

[32] The "national contingency plan" is a set of regulations promulgated by the EPA that establishes procedures and standards for responding to releases of hazardous substances, pollutants and contaminants. 42 U.S.C. § 9605; *see* 40 C.F.R. Part 300 (1995).

[33] However, a person who can successfully establish a defense under § 107(b), 42 U.S.C. § 9607(b), is not a potentially responsible person. *See id.* § 9601(35); *United States v. CDMG Realty Co.*, 96 F.3d 706, 721 (3d Cir. 1996) (discussing "innocent owner defense"); H.R. Conf. Rep. No. 99-962, at 186-88 (1986), reprinted in 1986 U.S.C.C.A.N. 3276, 3279-81 (same). No party has pled any of these enumerated defenses.

318

F.3d 1489, 1496 (11th Cir. 1996); *United States v. Colorado & Eastern R.R. Co.*, 50 F.3d 1530, 1536 (10th Cir. 1995); *United Technologies Corp. v. Browning-Ferris Indus., Inc.*, 33 F.3d 96, 99 (1st Cir. 1994); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir. 1994); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir. 1989)).

██ A § 107 cost recovery action imposes strict liability on potentially responsible persons for costs associated with hazardous waste clean-up and site remediation. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir. 1992); *see also CDMG Realty*, 96 F.3d at 712; *Colorado & Eastern*, 50 F.3d at 1535 ("it is now well settled that § 107 imposes strict liability on [PRPs]"); *Tippins Inc. v. USX Corp.*, 37 F.3d 87, 92 (3d Cir. 1994); H.R. Rep. No. 99-253(I), at 74 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2856 ("liability under CERCLA is strict, that is, without regard to fault or willfulness"). In general, a § 107 cost recovery action also imposes joint and several liability on potentially responsible persons. *Alcan*, 964 F.2d at 268; *see also Rumpke of Indiana, Inc. v. Cummins Engine Co., Inc.*, 107 F.3d 1235, 1240 (7th Cir. 1997); *Colorado & Eastern*, 50 F.3d at 1535 ("it is also well settled that § 107 imposes joint and several liability on [PRPs] regardless of fault"); *United Technologies*, 33 F.3d at 100 (recognizing "presumed existence of joint and several liability"); *United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1280 (3d Cir. 1993).

██ In contrast, the term "contribution" is a standard legal term referring to a claim "by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make." *Halliburton*, 111 F.3d at 1121 (citing *United Technologies*, 33 F.3d at 99 (citation omitted)). To resolve a contribution claim, § 113 provides that "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).[34] A potentially responsible person should not be permitted to recover

---

[34]Thus, while a defendant in a § 107 action can only avoid joint and several liability by demonstrating that the harm at a given site is divisible, parties to a § 113 action may allocate among potentially responsible persons based on equitable considerations. *Id.* at 1122 n.6.

all of its costs from another potentially responsible person, but that party should be able to recoup that portion of its expenditures which exceeds its fair share of the overall liability. *Halliburton*, 111 F.3d at 1122. Thus, § 113 provides potentially responsible persons with an appropriate vehicle for such recovery. *Id. (citing CDMG Realty*, 96 F.3d at 712 (individual liable under § 107 may seek contribution from other parties pursuant to § 113; *Tippins*, 37 F.3d at 92 (same)). In essence, § 113 does not in itself create any new liabilities but instead confirms the right of a potentially responsible person under § 107 to obtain contribution from other potentially responsible persons. *Id.* (citation omitted).

The *Halliburton* case recently decided by the Third Circuit is the closest authority the Court and the parties have uncovered in addressing the issue of what remedy is available to whom. In that case, a landfill owner that incurred cleanup costs pursuant to a CERCLA consent decree sought to recover costs from a response action contractor that allegedly improperly installed a monitoring well. *Id.* at 1119. The plaintiff in *Halliburton*, New Castle County, Delaware, argued that potentially responsible persons should have the choice to proceed under either § 107 or § 113. *Id.* at 1123. The Third Circuit disagreed, stating:

> Since section 107 was designed to enable innocent persons who incur expenses cleaning up a site to recover their costs from potentially responsible persons, a potentially responsible person does not experience section 107 injury and cannot obtain section 107 relief. Instead, a claim by a potentially responsible person is "a quintessential claim for contribution" (citation omitted). Section 113(f)(1) confirms this fact, permitting a party to seek contribution from "any other" party potentially liable under section 107 (citation omitted).

*Id.* at 1122; *see also Colorado & Eastern*, 50 F.3d at 1536 (if potentially responsible persons were permitted to recover from other potentially responsible persons under section 107, section 113 would be rendered meaningless). As a potentially responsible person, New Castle County could only bring an action under § 113, not under both § 113 and § 107. *Id.* at 1126.

320

This ruling would seem to bar third-party plaintiffs from bringing a cost recovery action under § 107, thus limiting them to an action for contribution under § 113. The *Halliburton* court, in resolving some major issues developing among the district courts of this circuit,[35] did not address the exact factual situation now before this Court. The Circuit merely dealt with the issue before it, stating:

> We do not decide under what circumstances a private individual may rely on section 107, or whether we endorse any of the exceptions for "innocent" landowners suggested by our sister courts. It is sufficient that we decide that a potentially responsible person under section 107(a), who is not entitled to any of the defenses enumerated under section 107(b), may not bring a section 107 action against another potentially responsible person.
>
> Where both parties are 'non-innocent' responsible persons, our sister courts have unanimously held that any action to reapportion costs between the parties is an action for contribution [citations omitted] . . . We agree.

*Id.* at 1124. The court noted that New Castle County conceded that it was a potentially responsible person under § 107(a), and that therefore was not permitted under any scenario to pursue cost recovery against other potentially responsible persons. *Id.* What is most important to the case at bar, and what makes *Halliburton* distinguishable, is the Third Circuit's explanation of the liability

---

[35] How the courts have lined up on this issue has been anything but uniform. Some courts within the Third Circuit have not allowed potentially responsible persons to sue under both § 107 and § 113. *Transtech Indus., Inc. v. A & Z Septic Clean*, 798 F. Supp. 1079 (D.N.J. 1992), *appeal dismissed*, 5 F.3d 51 (3d Cir. 1993), *cert. denied*, 114 S.Ct. 2692 (1994); *Ciba-Geigy Corp. v. Sandoz Ltd.*, 1993 WL 668325 *7 (D.N.J. 1993); *SC Holdings, Inc. v. A.A.A. Realty Co.*, 935 F. Supp. 1354 (D.N.J. 1996). Other district courts have held that both remedies could be pursued. *Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*, 891 F. Supp. 221 (E.D.Pa. 1995); *FMC Corp. v. United States Dep't of Commerce*, 786 F. Supp. 471, 486 (E.D.Pa. 1992), aff'd, 29 F.3d 833 (3d Cir. 1994) (en banc); *United States v. Kramer*, 757 F. Supp. 397, 416-17 (D.N.J. 1991); *Gould Inc. v. A & M Battery and Tire Serv.*, 901 F. Supp. 906 (M.D.Pa. 1995). The Supreme Court did not reach this issue in *Key Tronic Corp. V. United States*, 511 U.S. 809 (1994). The very narrow holding in *Key Tronic* was that § 107 does not provide for the award of attorneys fees associated with bringing a cost recovery action. *Id.* at 819. Fortunately, however, the Third Circuit, in *Halliburton*, has made a definitive ruling which this Court can look to for guidance.

posture it had before it. This determination on the availability of CERCLA remedies hinged to a significant extent on the resolution of liabilities in that particular case:

New Castle argues that the consent decrees did not constitute admissions of liability . . . and that it is now a consent decree signatory and not a potentially responsible person. Application of section 113 does not rest upon a finding of liability, however; *a potentially responsible person who has 'resolved its liability to the United States' in a 'judicially approved settlement' may seek contribution.* 42 U.S.C. § 9613(f)(3)(B). *While New Castle did not admit liability, it did resolve its liability.* Indeed the consent decrees state that the signatories 'resolved their liability to the United States.' As a potentially responsible person who resolved its liability to the United States, New Castle is required to use section 113, and only section 113, to obtain an equitable redistribution of liability among other potentially responsible persons. *See, e.g., Redwing Carriers,* 94 F.3d at 1496 (potentially responsible person who resolves liability in consent decree is still required to pursue contribution claim under section 113 and not section 107).

*Id.*, 111 F.3d at 1124 n.8 (emphasis supplied). The settlement posture in the case at bar is far different from that in *Halliburton*. The United States — more specifically the EPA — has never sued those parties which are now third-party plaintiffs. It has instead pursued its goals of remediating the Tutu Wells site administratively, by issuing Administrative Orders of Consent to various PRPs named in the Record of Decision. ROD at 2-3. A draft Consent Decree was arrived at but never agreed to and signed by the parties or by the Court. Moreover, as counsel for Esso points out, no PRP in this case as admitted CERCLA liability, been found liable under CERCLA, or "resolved its liabilities to the United States" in a judicially approved settlement." Lehman Letter of July 1, 1997 at 1. The Court notes that any kind of settlement in this case, however small, has been elusive. There simply has been no settlement between the third-party plaintiffs and the United States,

which has not intervened as a litigant. Accordingly, the Court concludes that *Halliburton* does not, based on the facts in the case at bar, compel a dismissal of the third-party plaintiffs' CERCLA claims under § 107(a), limiting these parties to contribution claims under § 113. While they were named as PRPs by the EPA, third-party plaintiffs are still "innocent" parties for CERCLA purposes.

4. Cross-Motions for Summary Judgment Under § 107(a)(2)

The Laga defendants make several arguments in support of their motion for summary judgment on claims that they are liable as owners or operators of the Laga facility for past and future response costs. The claims arise under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2), which provides that ". . . any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . shall be liable for (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . ." Counsel for the Laga defendants first argue that they are entitled to summary judgment because the Third Circuit reversed and remanded the judgment of this Court "with instructions to . . . dismiss Gal and Lazare in their capacities as officers and directors of [Laga, Duplan and Panex], on the ground that no judgment can be obtained against the dissolved corporations and therefore no claims can be maintained against their former officers or directors." Panex Br. at 13-14 (*citing In re Tutu Wells Contamination Litig.*, No. 95-7280, slip. op. at 17 (3d Cir. filed Dec. 21, 1995)). Second, they contend that there is no evidence to support any CERCLA claim against Gal and Lazare based on their actions as officers and directors of the Laga facility. Esso disputes this contention and offers its own evidence which it claims warrants the Court entering summary judgment in its favor. Third, Gal and Lazare argue that they are not liable to third-party plaintiffs because they were merely Panex shareholders. Finally, they maintain that because the CERCLA claims now brought against them did not exist and were unknown at the time of the Panex dissolution and subsequent asset distribution, they are not liable to third-party plaintiffs.

(a) The Third Circuit did not preclude individual liability claims against Gal and Lazare

The parties have disputed the meaning and mandate of the Court of Appeals' 1995 decision in this case and what this decision means for the viability of the third-party plaintiffs' CERCLA claims against the Laga defendants. The appellants in that case are described by the Court of Appeals as follows:

> . . . Laga Industries, Ltd., a former Virgin Islands corporation, dissolved in 1981 ("Laga"); the Duplan Corporation, a former Delaware Corporation, reorganized and discharged in bankruptcy in 1981 ("Duplan"); Panex Industries, Inc., a former Delaware corporation and the successor of Duplan following Duplan's bankruptcy reorganization, dissolved in 1985 ("Panex"); and Andreas Gal and Paul Lazare in their capacities as former officers or directors of Laga, Duplan and Panex (collectively, the "Laga defendants").

*In re Tutu Wells Contamination Litig.*, No. 95-7280, slip op. at 3. Referring to Panex, Duplan, and Laga, the Court expressed its judgment as follows:

> Under the laws of Delaware and the Virgin Islands, these three corporations were thus without capacity to be sued well before this action was commenced. As with the common law claims, the CERLCA claims against *Gal and Lazare in their capacities as former officers and directors* of the dissolved corporations must also be dismissed because no judgment may be obtained against the former corporations. *Therefore, all of the claims, under both CERCLA and the common law, should be dismissed against all of the Laga defendants.*

*Id.* at 15 (emphasis supplied). Third-party defendants contend that this sweeping language dismissing "all claims" against "all of the Laga defendants" warrants a grant of summary judgment. They also assert that this Court ignored the mandate of the Court of Appeals by not dismissing "all claims" and by allowing third-party plaintiffs herein to file their complaints. Panex Br. at 20. The

only parties which should have been dismissed as the "Laga defendants," however, are those described as "Laga defendants" in the Third Circuit's statement of the parties before it on appeal, which statement is quoted above. What third-party defendants conveniently fail to mention is a critical footnote in the Court of Appeals' slip opinion which further delineates which parties are bound by its decision:

> Andreas Gal and Paul Lazare are also the only two partners of Panex Co., a New York general partnership that is another party to this case. *However, Panex Co., and Gal and Lazare in their capacities as partners,* are separately represented below, *are not appellants here,* and are not subject to the injunction order.

*Id.* at 3 n.1 (emphasis supplied). Furthermore, the court stated that while "[t]he mere existence of the [Panex] Trust does not give the dissolved corporations themselves capacity to sue or be sued," *id.* at 15, "the [Panex] Trust here is . . . a separate legal entity, and although the Trust and its Trustees can be sued directly, they are not among the named parties to this action," *id.* Also not before the Third Circuit at the time it issued its opinion, and not bound by its decision, is the newly created Successor Trust in Delaware. The Third Circuit's opinion is silent on the issue of whether Gal and Lazare may be sued in their personal capacities under CERCLA.

Whether individuals may be sued personally under CERCLA, separate and apart from their capacities as officers and directors of a dissolved corporation, was an issue the Court of Appeals grappled with in *Witco Corp. v. Beekhuis,* 38 F.3d 682 (3d Cir. 1994). In *Witco,* the corporate owner of an environmentally contaminated site brought a contribution claim under CERCLA against a decedent's estate. *Id.* at 685. The plaintiff contended that the decedent incurred CERCLA liability by his own conduct, and was not insulated from that liability by having set up a corporate entity and designating himself as an officer and director. *Id.* at 692. In response, the Third Circuit concluded:

> We are satisfied that under federal law, Dr. Beekhuis, as a director and officer, may be found personally liable as an "operator" within the meaning of CERCLA. *See Sidney S.*

*Arst Co. v. Pipefitters Welfare Educational Fund*, 25 F.3d 417, 420 (7th Cir. 1994) (corporate officers and directors may be held personally liable as "operators" within the meaning of CERCLA and that this direct, personal liability is distinct from derivative liability for corporate violations); *Riverside Mkt. Dev. Corp. v. International Bldg. Prods., Inc.*, 931 F.2d 327, 330 (5th Cir. 1991) ("CERCLA prevents individuals from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct prohibited by the Act."); *United States v. Kayser-Roth Corp.*, 910 F.2d 24, 26-27 (1st Cir. 1990) (noting cases in which parent corporations and share-holders were held liable as "operators" under CERCLA); *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d [726, 743-44 (8th Cir. 1986)] (Congress intended CERCLA liability to attach to corporate officers). Witco alleges that Dr. Beekhuis personally designed many of the chemical manufacturing and disposal processes used at the site and directed construction and maintenance of a lagoon and drainage ditch at the site into which chemical waste was regularly disposed. We acknowledge that these allegations may form the basis of Dr. Beekhuis' personal "operator" liability under CERCLA.

Clearly, the Third Circuit has provided for the possibility that former corporate officers and directors can be sued separate and apart from their corporate status. Consistent with this approach, the Third Circuit's opinion in the instant litigation is noteworthy not only for what it says, but also for what it does not. The Third Circuit did not reach the issue of Gal and Lazare's personal responsibility under CERCLA because it never had that issue before it, or these individuals in their personal capacities, before it.[36]

---

[36] Panex Co., of which Gal and Lazare were partners, is also not bound by the Court of Appeals' decision. *See In re Tutu Wells Contamination Litig.*, No. 95-7280, slip op. at 3 n.1. 42 U.S.C. § 9601(D)(21) provides that a corporation may incur CERCLA liability. However, given that third-party plaintiffs seek to hold Gal and Lazare personally liable under § 107(a)(2) and (3), their former corporation cannot also be found liable under these provisions. A corporation cannot logically be sued in a "personal" or "individual"

(b) There are genuine factual issues precluding an award of summary judgment to either side

### (i) "Owner" liability under CERCLA

■ A CERCLA plaintiff must meet four elements to establish CERCLA liability: (1) that hazardous substances were disposed of at a "facility"; (2) that there has been a "release" or "threatened release" of hazardous substances from the facility into the environment; (3) that the release or threatened release has required or will require the expenditure of "response costs"; and (4) that the defendant falls within one of four categories of responsible parties. *United States v. CDMG Realty*, 96 F.3d 706, 712 (3d Cir. 1996) (*citing* 42 U.S.C. § 9607(a)); *see also United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258-59 (3d Cir. 1992)). There is not much dispute between the parties on whether the Laga plant was a "facility" under CERCLA. Nor is there much question that there has been a "release" of contaminants into the Tutu aquifer. The findings arrived at by the EPA, and summarized in the ROD, bear this out. Furthermore, it should go without saying that some PRPs to this litigation have incurred significant response costs as a result of their own compliance with EPA administrative orders, in some cases into the millions of dollars.

To reiterate, CERCLA makes four classes of persons liable for contribution or response costs: (1) the current owner or operator of a facility, 42 U.S.C. § 9607(a)(1); (2) any person who owned or operated the facility "at the time of disposal" of a hazardous substance, *id.* § 9607(a)(2); (3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at the facility, *id.* § 9607(a)(3); and (4) any person who accepts or accepted hazardous substances for transport to sites selected by such person, *id.* § 9607(a)(4). *CDMG Realty*, 96 F.3d at 713. The definition of "operator" under CERCLA is "any person . . . operating such facility." 42 U.S.C.

---

capacity. On the other hand, Panex Co., the partnership consisting of Gal and Lazare, not being bound by the Third Circuit's mandate of dismissal, is still a potentially liable entity for contribution under § 113 of CERCLA, as such claims raise no alleged personal or volitional wrongdoing as is the case the third-party claims brought under § 107.

§ 9601(20)(A)(ii). Subsections 9607(a)(1) and (a)(4) are not issue in this case. At issue in both sides' cross-motions for summary judgment is Gal and Lazare's "owner" or "operator" liability under (a)(2).[37]

Gal and Lazare contend that they are entitled to summary judgment because there is no substantial evidence that they are liable as "owners" or "operators" under CERCLA for alleged contamination to the Tutu aquifer emanating from the Laga building. It is in this context that the Court will simultaneously consider Esso's cross-motion for summary judgment against Gal and Lazare under § 107(a)(2), 42 U.S.C. § 9607(a)(2) for "owner" or "operator" liability, as the two motions involve overlapping and interrelated factual inquiries.[38] First, the Court will focus on whether Gal and Lazare were "owners" as defined by CERCLA.

In its attempt to establish "owner" liability, Esso states that, "Gal and Lazare are the only partners of Panex Co., which purchased the Laga facility on December 12, 1979." Esso Br. in Support of Summ J. at 19 (citing Ex. I). As Esso also points out, this Court found:

> With respect to Panex Co., a New York partnership (of which Lazare and Gal are the only partners), it is the record owner of the Laga, Ltd. building as of December 12, 1979, and it is potentially liable under CERCLA . . . .

*Id.* (*citing In re Tutu Wells Contamination Litig.*, 846 F. Supp. 1243, 1281-82 (D.V.I. 1993)). Manufacturing at the Laga plant apparently ceased in 1978, however, the last year there was any income generated by the plant. *See* Third-party Defs.' Ex. K at 6. Inventory at the factory was taken as of October 1, 1978. *Id.* Gal and Lazare could not have owned the facility at any time during which there was a "disposal" of hazardous chemicals in the common and business understanding of the term "owned."

---

[37] The Court will consider liability under § 9607(a)(3) in a subsequent section of this opinion.

[38] Indeed, Esso's cross-motion for summary judgment as to the individual liabilities of Gal and Lazare is almost strictly fact-based, and neatly confines its analysis to Gal and Lazare's CERCLA liability as either "owners" or "operators" under § 107(a)(2). As such, it is particularly well-suited to simultaneous consideration with Gal and Lazare's own fact-based motion for summary judgment under § 107(a)(2).

This, of course, does not end the inquiry into Gal's and Lazare's potential ownership liability. While in common parlance the term "disposal" connotes some sort of volitional act, under CERCLA the term "disposal" is given a much more expansive reading. 42 U.S.C. § 6903(3) defines "disposal" for CERCLA purposes as ". . . the discharges, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

Without reaching issues of admissibility and the extent of the personal knowledge of certain deposed witnesses, there is evidence, based on the EPA's remedial investigation, that at one point there was a pipe in the floor of the Laga facility through which hazardous residues may have made their way into the ground as a result of the dry cleaning operations at Laga:[39]

> One composite oil sample (TWS-06) was collected from two pipes within the floor of the [former Laga] building . . . These abandoned pipes appeared to have been cut to floor level and lag bolts were observed . . . Sample TWS-06 contained 300,000,000 ug/kg PCE (30 percent PCE) and several BNAs.

Esso Ex. E, April 1995 RI, at 5-8. PCE, the acronym for Tetrachloroethylene, is the chemical even Gal and Lazare refer to as "perk" or "perc." The presence of such chemicals in the pipes at the very least gives rise to the allegation that these chemicals were, at one time, actively allowed to seep into the ground at the Laga facility. The question, then, is whether there was a "disposal" which occurred in the time during Gal's and Lazare's actual ownership of the property, as opposed to the time period from 1970 to the time the plant closed.

---

[39] Both sides in this case argue that the deposition testimony of various former employees is or is not admissible at trial and thus should not be considered by the Court at the summary judgment stage. Such evidentiary rulings are unnecessary at this time, as the Court has been able to use evidence about which the parties do not dispute for purposes of arriving at its decision.

■ Under 42 U.S.C. § 6903(3), "disposal" — defined in part as "discharge" or "placing" of waste "into or on any land or water" — includes not only the initial introduction of contaminants onto a property but also the spreading of contaminants due to subsequent activity. *CDMG Realty*, 96 F.3d at 719 (*citing* Webster's Third New International Dictionary, Unabridged 644 (Philip Babcock Gove & the Merriam-Webster Editorial staff eds., 1986) (defining "discharge" in part as "to set at liberty," "release from confinement, custody, or care," "pour forth," or "emit"); *id.* at 1727 (defining "place" in part as "cause to rest or lie")); *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342-43 (9th Cir. 1992) (CERCLA's definition of 'disposal' expressly encompasses the 'placing of any . . . hazardous waste . . . on any land.' 42 U.S.C. § 6903(3). Congress did not limit the term to the initial introduction of hazardous material onto property."); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988) ("[T]his definition of disposal does not limit disposal to a one-time occurrence — there may be other disposals when hazardous substances are moved, dispersed, or released during landfill excavations and fillings.").[40] Moreover, the "dispersal of contaminants need not reach a particular threshold level in order to constitute 'disposal,'" *CDMG Realty*, 96 F.3d at 719, and there is no exception for de minimis disturbances, *id.* The fact that a defendant's dispersal of contaminants is trivial may provide a ground to allocate less liability to that defendant, but it is not a defense to liability. *Id.*

■ The Third Circuit has held that "passive migration" of hazardous wastes cannot constitute disposal. *CDMG Realty*, 96 F.3d at 714. While "leaking" and "spilling" may not require affirmative

---

[40] In *CDMG Realty*, 96 F.3d at 719 n.12, the Third Circuit referred to other cases as well: *Burlington Northern R.R. Co. v. Woods Indus., Inc.*, 815 F. Supp. 1384, 1392 n. 12 (E.D. Wash. 1993) ("That the facility was contaminated when Hansen acquired it is not a defense to liability . . . given Hansen's subsequent role in dispersing contaminated building materials at the site."); *Ganton Technologies, Inc. v. Quadion Corp.*, 834 F. Supp. 1018, 1022 (N.D. Ill. 1993) ("[T]his court follows *Kaiser* and holds that "dispersal" is not limited to the initial introduction of contaminants into a site."); *Portsmouth Redevelopment & Hous. Auth. v. BMI Apartments Assoc.*, 827 F. Supp. 354, 357-8 (E.D. Va. 1993) (General allegations that defendants "moved some dirt around in the course of constructing apartment buildings now on Site" are legally sufficient to overcome a 12(b)(6) motion).

330

human conduct, neither term encompasses the gradual spreading of contamination which is at issue in this case. *Id.* A common definition of "leak," the Court of Appeals noted, is "to enter or escape through a hole, crevice, or other opening." *Id.* (*citing* Webster's, *supra,* at 1285). This definition requires that a substance "leak" from some opening. *Id.* The *CDMG* court also distinguished the term "spilling," which sometimes denotes movement of liquid in the absence of human action, and does not cover the spreading of waste. *Id.* Passive definitions of "spill" suggest a rapid torrent, not gradual passive migration over the course of several years. *Id.* (*citing* Webster's, *supra,* at 2195 (defining "spill" as, *inter alia,* "to flow, run, or fall out, over, or off with waste, loss, or scattering as the result" and as "to come, go, or pass with a turbulent rush [; to] pour in an unrestrained, profuse, or disorderly manner"). In accordance with the Third Circuit's definition of "disposal," the passive migration of hazardous waste during an isolated period of time in which Gal and Lazare actually were the owners of record of the Laga property cannot suffice for "owner" liability under § 107(a)(2). The Court next turns to an assessment of potential "operator" liability for Gal and Lazare.

### *(ii) "Operator" liability under CERCLA*

In *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209 (3d Cir. 1993), the Third Circuit first adopted the "actual control" standard for determining "operator" liability under CERCLA. Under the actual control standard, a corporation will only be held liable for the environmental violations of another corporation when there is evidence of substantial control exercised by one corporation over the activities of the other. *Id. at 1221 (citing United States v. Kayser-Roth Corp.,* 910 F.2d 24, 27 (1st Cir. 1990), *cert. denied,* 498 U.S. 1084 (1991)).[41] Following *Kayser-Roth,* and another

---

[41] While the seminal Third Circuit cases discussing the "actual control" standard as it applies to "operator liability" under § 107(a)(2), 42 U.S.C. § 9607(a)(2) deal with parent corporations controlling subsidiary and sister corporations, the same analysis applies to individuals such as Gal and Lazare. 42 U.S.C. § 9601(D)(21) defines a "person" as "*an individual,* firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." Indeed, the third-party complaints *sub judice* are against Gal and Lazare in their individual capacities.

district court opinion, the Third Circuit enunciated the test as follows:

We follow the test adumbrated in *Kayser-Roth* . . . and *CPC Int'l v. Aerojet-General Corp.*, 777 F. Supp. 549 (W.D. Mich. 1991). As the *Kayser-Roth* court explained, "[t]o be an operator requires more than merely complete owner-ship and the concomitant general authority or ability to control that comes with ownership. At a minimum, it required active involvement in the activities of the sub-sidiary." 910 F.2d at 27. Whereas a corporation's "mere oversight" of the subsidiary or sister corporation's busi-ness in a "manner appropriate and consistent with the investment relationship" does not ordinarily result in operator liability, a corporation's "actual participation and control" over the other corporation's decision-mak-ing does. *CPC Int'l*, 777 F. Supp. at 573.

The determination of whether a corporation has exerted sufficient control to warrant imposition of operator liability requires an inherently fact-intensive inquiry, involving consideration of the totality of the circumstances presented. *Lansford-Coaldale*, 4 F.3d at 1222 (citation omitted). The factors to consider, the Third Circuit noted, "focus on the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions." While evidence of control over a sister or subsidiary corporation's environmental decisions is "indicative of the type of control necessary to hold a . . . corporation liable as an operator," *id.* at 1222 n. 13 (citation omitted), operator liability may be established even without evidence that a corporation controlled the environmental decisions of an affiliated corporation as long as there exist other factors which sufficiently demonstrate pervasive control, *id.* "The test is concerned with control rather than owner-ship and there is no reason not to hold a corporation liable when it exercises substantial management control over an affiliated corporation." *Id.* at 1222.

In applying the actual control test in *FMC Corp. v. United States Dep't of Commerce*, 29 F.3d 833 (3d Cir. 1994)[42] to a situation where a United States government agency took over production at a facility, the Third Circuit, in holding the government liable as an operator, noted the following facts giving rise to liability:

> In our view, it is clear that the government had "substantial control" over the facility and had "active involvement in the activities" there. The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product.

*Id.* at 843.

Turning to the facts of this case, Gal and Lazare claim that they played no role in the day-to-day operations of the plant. Panex Br. at 26. Lazare also claims he was stationed in New York and was involved almost exclusively in sales and marketing, *id.* at 28, and traveled to the Virgin Islands only once a year (and sometimes less) and had no knowledge of plant employees' alleged improper use and disposal of the chemical PCE, used in the plant's dry-cleaning operations, *id.* Similarly, counsel for Gal and Lazare point out that "Gal seldom visited the site (three times a year or less); he had no direct day-to-day involvement with operations, especially the dry cleaning machine, and he never was informed of any improper disposal of PCE." *Id.* Counsel for Gal and Lazare instead shift the focus and the blame onto Laga's management personnel, who presided over daily operations. *Id.* at 29.

---

[42] The Third Circuit noted in *FMC Corp.* that although "Lansford-Coaldale arose in the context of related corporations, it is nevertheless instructive" in the situation of a U.S. government agency. *Id.* at 843.

In response, Esso points to evidence that Gal and Lazare should be held liable as "operators" under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2). This evidence, Esso asserts, tends to show that Gal and Lazare were more involved in the Laga operations such that they were not mere absentee landowners who knew nothing about how the plant operated or what chemicals were used.

Lazare's deposition testimony reveals that he and Gal initially chose the location for the Laga facility, and that they chose St. Thomas based on their business experience in running a different facility called "Buccaneer Mills." Lazare Dep. at 40-41; Esso Ex. L. Gal admitted that he and Lazare financed the project. Gal Dep. at 24; Esso Ex. M. Lazare testified that they were involved in decisions regarding the construction of the plant. *Id.* at 67-68; Esso Ex. M. Gal also testified that with regard to design of the plant, he told his contact person, John Evans of the Lockwood & Greene architectural firm, how many and what kinds of machines the plant had to accommodate. Gal Dep. at 158-59; Esso Ex. M. Former plant manager John Hartley also testified that no one in the Virgin Islands made production decisions. Rather, instructions on what was to be produced and the production time came from New York, where Gal and Lazare resided. Hartley Dep. at 33; Esso Ex. N. Gal and Lazare together determined the prices of their manufactured fabrics, Gal Dep. at 334; Esso Ex. O, and Lazare knew that dry cleaning was necessary to ensure the quality of the fabrics the plant produced, Lazare Dep. at 334; Esso Ex. O.

It is also clear that Gal was mainly in charge of buying the raw materials for the plant. Gal Dep. at 28, Lazare Dep. at 53; Esso Ex. at P. Even more telling, however, is that Gal was engaged in the plant's cost control and knew that PCE or "perc" was used:

Q: How did you hear the word perc used during your visits?

A: When we spent the money everything finally came to my desk for cost control, and one of the item[s] was the perc expenses.

Q: So you knew that perc was used at the Laga site during 1970 and 1974?

A: I knew that perc chemical was used . . .

334

Q: When perc was ordered by Laga Industries Ltd. was it ordered in quantities above $500?

A: I think so. I don't know how much cost the perc [sic]. I was not busy with this. But most probably cost more [sic] because it was cost-effective when you didn't ship one barrel, one barrel, one barrel, but five or ten or fifteen, whatever it's [sic] needed . . . .

Gal Dep. at 120-21, 356-57; Esso Ex. P. Such testimony, though not unequivocal, is hardly that of an absentee plant operator with no knowledge of what supplies needed to be ordered or the best, most efficient and "cost-effective" manner in which to order them. Gal's deposition testimony also reveals that he "okayed the layout" of the finishing room, and that he had the authority to order equipment:

Q: Who had the authority to buy this [dry cleaning] equipment?

A: The local plant manager in consultation with our Asheville experts.

Q: And who was the local plant manager in October of 1970?

A: Winston Smith was the finishing supervisor, Mr. Jerry Schick was the assistant plant manager, and Mr. John Hartley was the vice president, plant manager.

Q: So Mr. Hartley was an officer of Laga Industries Ltd.?

A: He was vice president of Laga Industries Ltd.

Q: And in terms of making purchases, he had the authority, without your approval, to order a Permac dry cleaner in the amount of $13,957?

A: He had the authority, but most probably he okayed with me.

Q: The same question with regard to an automatic solvent reversing reclaimer in the amount of $2,322.

A: Same answer.

*Q: In fact, sir, did you not review every check in the amount of $500 or more?*

*A: Yes, I did . . .*

Q: At some point did Mr. Hartley tell that you [sic] the dry cleaning machine and the still had been installed at the Laga facility?

A: I was aware . . .

Q: At some point between 1970 and 1974 did Mr. Hartley tell you that the dry cleaning machine was being used to clean fabric at Laga?

A: He didn't tell me, but I knew about it that it is.

Q: And how did you become aware that the machine was being used at Laga?

A: I visited the factory . . . .

Gal Dep. at 353, 402, 406; Esso Ex. Q. Lazare, moreover, set schedules and deadlines to be met by informing Mr. Hartley, the plant manager. Lazare Dep. at 315-16; Esso Ex. R.

As further evidence in support of its contentions that Gal and Lazare controlled the plant from New York, Esso points out that Lazare testified to directing sales and marketing of the plant's finished products. Lazare Dep. at 50-51; Esso Ex. S. Mr. Hartley further testified that Laga Industries' offices in New York, which had more employees there than in St. Thomas, received all invoices and controlled payroll. Hartley Dep. at 36-7; Esso Ex T. Additionally, "[a]ll records, the financial records, the purchasing and payment of those invoices were done in New York. We [in St. Thomas] were a production arm of the company." *Id.* at 37. Gal and Lazare also made hiring decisions for the plant. Lazare Dep. at 75-6; Esso Ex.V.

While the evidence offered above by Esso would seem to indicate some control of the facility by Gal and Lazare, their deposition testimony is hardly so airtight as to leave the Court with the impression that there are no genuine factual issues in dispute. The deposition testimony cited above tends to be riddled

with questions and answers which contradict the notion that Gal and Lazare had the requisite level of control Esso suggests. Lazare also stated in his deposition:

Q: What decisions were you involved in regarding build-ing the plant?

A: To build a plant.

Q: Other than the decision to build the plant, what decisions regarding how the building was going to be built were you involved in?

A: None . . . [Lazare Dep. at 68; Esso Ex. M]

Q: Do you recall the preparation of those documents, the design, the floor plan?

A: I'm not familiar with that.

Q: Do you recall ever seeing them?

A: No.

Q: Do you recall ever hearing about them? Did anybody ever mention to you that the plans were drawn?

A: I knew we had an engineering firm and I knew they were working.

Q: Did anybody ever discuss with you anything about the plans?

A: No. That was not my business, to discuss how you build a plant. [Lazare Dep. at 94; Esso Ex. M]

Similarly, Gal testified as follows:

Q: When the building was being constructed, did you have a role that you were playing during the construction period?

A: No.

Q: Did you have anything to do with supervision of the construction process?

A: No. [Gal Dep. at 376; Esso Ex. M]

337

With regard to whether Gal and Lazare determined and controlled the price and quality of the manufactured products, Lazare stated:

Q: So, in fact, you did give discounts to customers for advance orders?

A: I don't remember specifically, but it's possible . . . [Lazare Dep. at 279; Esso Ex. [O]

Q: And would it be your understanding that Mr. Hartley's — one of Mr. Hartley's duties would be to insure that the fabrics produced at Laga would be of high quality?

A: Absolutely . . . [Lazare Dep. at 323; Esso Ex. O]

Q: And those duties particularly with regard to manu-facturing and finishing as part of the quality control, would it be your understanding that that would be within the responsibility and the duties of Mr. Hartley?

A: Yes . . . [Lazare Dep. at 328-29; Esso Ex. O]

Q: If you had known that there was a dry cleaning process at Laga when Laga was operational, if you had known that that's how Laga was getting its fabrics cleaned —

A: Yes.

Q: — would you have assumed that that cleaning would have been under the supervision of Mr. Hartley?

A: Yes. [Lazare Dep. at 332-33; Esso Ex. O]

Perhaps the biggest question is the day-to-day control exercised by Gal and Lazare. Counsel for Gal and Lazare point to the fact that this was Hartley's domain:

Q: Did Mr. Gal give you the authority to run the Laga facility as you saw necessary to meet the production goals?

A: I think that's fair statement . . . [Hartley Dep. at 42; Esso Ex. V]

338

Q: Okay. So Mr. Hartley was given authority to run the plant —

A: Correct.

Q: — as he deemed necessary to produce a profitable product?

A: Correct . . . [Gal Dep. at 395; Esso Ex. V]

Q: And would you agree that Mr. Hartley had the authority to do whatever was necessary to meet the needs of the Laga facility and to run the facility as he saw fit?

A: Yes . . . [Gal Dep. at 395; Esso Ex. V]

Surely third-party plaintiffs could argue that some of the foregoing statements by the Hartley, Gal, and Lazare could be deemed to be self-serving. But this testimony is the nature of the evidence now before the Court on summary judgment. While some of the factors identified by third-party plaintiffs almost exactly match up with those which the *FMC Corp.* court found to be dispositive in showing "actual control,"[43] that particular case was on appeal to the Third Circuit following a bench trial and the entry of a final judgment as to liability. *FMC Corp.*, 29 F.3d at 836-37. The district court in FMC Corp. had the benefit of judging witness credibility and made its own findings of fact. *Id.* at 837. The case at bar, in contrast, is purely a paper action at this stage. This Court has not had the benefit of judging the credibility of witnesses or hearing expert testimony regarding alleged contamination. Nor has the discovery process been fully allowed to run its course.

More fundamentally, without the testimony of scientific experts for both sides, it is impossible for the Court to determine if PCE

---

[43] There appear to be several watchwords under the "actual control" test, as enunciated by the Third Circuit. The Court very recently stated: "[A] corporation cannot be held liable for CERCLA violations at a facility under the actual control test unless it is found to have either made day-to-day operating decisions concerning the facility *or exercised "pervasive control" over its policy-making." Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 564 (3d Cir. 1997) (emphasis supplied). There is "actual control," "substantial control," and "pervasive control." For purposes of this case, however, the evidence is conflicting as to whether Gal and Lazare exercised control which rose to the level of being "pervasive," thus also warranting a denial of summary judgment under this seemingly amplified standard.

339

and other chemicals found at the site spread from the time of Gal and Lazare's ownership until they sold the property to the Virgin Islands Government. The spreading into the plume of contamination currently at the Laga site may have been trivial or de minimis during the time Gal and Lazare were record owners of the property. Such spreading may also have been extensive, or even non-existent. Allocating liability between the parties is ill suited to a summary judgment posture.

Additionally, there is still some question as to whether the chemicals used at the Laga site during the time the plant operated were the sole cause of the contamination ascertained there by the EPA. The Court has already expressed concern over the existence of many 55-gallon drums behind what is now known as VIDE's Curriculum Center. While there is no way to state for certain, the existence of rotting drums of chemicals may be a factor in, and help explain, the contamination at the site. No appraisal report prepared in connection with the sale of the property mentions any drums, Ex. I, nor were any chemical drums listed on the inventory of items to be left on the site, Ex. J, suggesting that the Government may have placed them there after they acquired the property. There is also the allegation in need of ascertainment that VIDE and other government agencies (Lanclos, Sr. Dep., Vol. II at 13) have used the open area behind the main building on the property to store drums containing paints, solvents, cleaners, roofing compounds, insecticides, floor wax, soap, strippers and disinfectants (Donastorg Dep. at 20, 24, 47-8; Hendricks Dep. at 75-6, 78, 84-5; Lanclos Sr. Dep., Vol. I at 74, 87-9; Lanclos Sr. Dep., Vol. II at 23, 28). According to one witness, one chemical drum had partially obscured lettering on it reading "V.I. Dept. Of Educ. . .," Hendricks Dep. at 87, and other drums had on their exteriors names of companies with which VIDE did business, id. at 88. The credibility of this witnesses is still in need of assessment.

The two opposing sides to this motion are quick to lay sole blame for the contamination of the Tutu aquifer on each other in support of their arguments that they are entitled to summary judgment. But looking at the EPA's findings in the ROD reveals that the movants' suggestions that any one party to this litigation

is the sole polluter of the Tutu aquifer are simply premature.[44] There are all kinds of chemicals which are the culprits in this pollution, and there are various amounts of these different chemicals, having higher concentrations on the properties of the various parties to this litigation:

> Three properties were identified as having significant chlorinated VOC impact to soil, based on exceedance of EPA's site-specific SSLs [soil screening levels]: 1) the Curriculum Center, 2) Esso Tutu Service Station, and 3) O'Henry Dry Cleaners . . .

> At the Curriculum Center, approximately 3 to 1800 micrograms per kilogram (ug/kg) of PCE was detected in eight samples at the north-central side of the main building in the vicinity of the former discharge pipe and presumed former waste pit. TCE was detected in four samples at concentrations from 1 to 130 ug/kg. One chlorinated VOC, 1,1,1-TCA, was detected above the EPA's SSLs. It is suspected that higher concentrations of chlorinated VOCs may be present in the soil beneath the building or in the unsaturated bedrock. The elevated concentrations of chlorinated VOCs in groundwater adjacent to and immediately downgradient of the Curriculum Center indicate a high probability that pure product is present in the unsaturated zone as dense non-aqueous phase liquid (DNAPL) at the Curriculum Center.

> At the Esso Tutu Service Station, PCE, TCE, 1,1,1-TCA, 1,2-DCE, and 1,1-DCA were detected above EPA's SSLs in four samples at concentrations ranging from 44 to 3,200 ug/kg. These chlorinated VOCs were detected at the western portion of the property, near the north oil/water separator.

> PCE was found in the vicinity of the O'Henry Dry Cleaners above EPA's SSLs in the southwestern portion of

---

[44] The Court makes no determination at this time as to which parties are responsible, and to what extent. Such determinations are best suited to trial proceedings.

the property. The range of PCE concentration was 200 to 440,000 ug/kg. In addition, there is a potential for DNAPL to be present in the subsurface soils near the O'Henry Dry Cleaners since historical concentrations (up to 1,500 part per billion (ppb)) of PCE in groundwater in adjacent wells have exceeded 1 percent of the solubility of PCE . . .

The site-specific SSLs for BTEX compounds were exceeded at five properties: 1) the Curriculum Center (formerly the Laga Building), 2) Ramsay Motors, 3) Texaco Tutu Service Station, 4) Western Auto, and 5) Esso Tutu Service Station . . . . .

ROD at 6-7. Specifically, benzene and toluene compounds were found at the Curriculum Center, *id.* at 7, in addition to the already alleged PCE. Benzene and ethylbenzene were also detected in the vicinity of the underground storage tanks on the Ramsay Motors property and at the Texaco station. *Id.* On Western Auto's property, the EPA detected toluene, ethylbenzene, and xylenes. *Id.* Ethylbenzene and xylenes were also found at the Esso station. *Id.* Chlorinated VOCs have spanned out in a plume from the Curriculum Center. *Id.* at 8. A similar plume of contamination emanates from O'Henry (L'Henri) Dry Cleaners, consisting primarily of the chemicals PCE, TCE, and 1,2-DCE. *Id.* at 9. Plumes of BTEX chemicals have been detected from the Esso and Texaco service stations. *Id.*

 The EPA's findings are much more detailed and extensive than what is recounted herein. But a brief perusal of the ROD reveals that pinning sole responsibility for the contamination of the Tutu aquifer on one party is simply not possible at this time. Summary judgment is therefore inappropriate, given that it is difficult to determine how much, if any, of these chemical substances have migrated (and from what source), whether they have migrated, and at what point this migration may have started, if at all. Looking at the inconsistencies in the record at this stage of the proceedings, a grant of summary judgment to either party under CERCLA § 107, 42 U.S.C. § 9607(a)(2) holding Gal and Lazare

individually liable as "operators" would be improvident and premature.

*(iii) CERCLA liability as "arrangers"*

Third-party plaintiffs also allege that Gal and Lazare are personally liable under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3) as persons who "arranged for disposal" of hazardous substances at Laga. That section provides that liability attaches to:

> [a]ny person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances . . . .

*Id.* Gal and Lazare contend that they did not arrange for the disposal of any hazardous substances, and that the dry cleaning equipment they purchased was specifically designed so as not to require or cause any "disposal" of PCE. Panex Defs.' Br. at 82.

Cases concerning the liability of corporate officers and employees as hazardous waste "generators" or "arrangers" of hazardous waste disposal under § 107(a)(3) have generally required actual participation in the liability-creating conduct. *United States v. USX Corp.*, 68 F.3d 811, 824 n.25 (3d Cir. 1995) *(citing United States v. Northeastern Pharmaceutical Co.*, 810 F.2d 726, 743-4 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987) (liability imposed on plant supervisor who "actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal" of hazardous substances); *United States v. Ward*, 618 F. Supp. 884, 894-5 (E.D.N.C. 1985) (corporate officer of an electrical equipment rebuilder was personally involved in the decision to dispose of transformer fluid containing hazardous substances); *United States v. Bliss*, 667 F. Supp. 1298, 1306 (E.D. Mo. 1987) (plant supervisor and chief executive officer who personally arranged for the disposal of liquid materials containing hazardous substances); *Commonwealth of Massachusetts v. Blackstone Valley Elec. Co.*, 777 F. Supp. 1036 (D. Mass. 1991) (corporate officers entitled to summary

judgment where the evidence established that they had not personally participated in conduct that violated CERCLA)).[45] Section 107(a)(3), the Third Circuit noted, is structured much like § 107(a)(4), imposing liability for specific conduct, and is thus unlike § 107(a)(1) and (a)(2), which impose liability on the status of ownership or as an operator of a hazardous facility where there has been a release of hazardous chemicals. *USX Corp.*, 68 F.3d at 824 n.25. Another district court in the Third Circuit, addressing "arranger" liability, has expounded on what is required for a proper showing under this provision of CERCLA:

> [The] court's independent research has failed to reveal[] any case in which a defendant who is not even alleged to have known about the disposal of hazardous wastes has, nonetheless, been deemed to have "arranged for the disposal" of such hazardous wastes. At a minimum, knowledge of the waste disposal arrangement must be alleged in order to trigger "arranger" liability. Perhaps an "arranger" need not know that the wastes disposed of are hazardous, but the statute is clear that the arranger must know of the disposal of some waste materials.

*Lentz v. Mason*, 961 F. Supp. 709, 716-17 (D.N.J. 1997) (Orlofsky, J.). The parties participating in third-party defendants' summary judgment motions have unfortunately neither pled nor briefed this issue particularly well. The Court can discern no allegations from the third-party complaints that Gal and Lazare personally participated in the disposal of hazardous chemicals at the Laga site. Nor is there any allegation that Gal and Lazare had knowledge of a disposal of any kind. Almost as a passing reference, Gal and Lazare deny having "any knowledge of, nor any influence over, any inadequate waste disposal practices." Panex Defs.' Reply Br. at 40.

 While some testimony of certain former Laga employees — and of Gal and Lazare themselves — suggests that Gal and Lazare

---

[45]The Court notes that, in keeping with the Court of Appeals' not reaching the issue of whether claims against Panex Co., or against Gal and Lazare in a capacity other than as officers or directors remained viable, § 107(a)(2) and (a)(3) claims could theoretically proceed against Gal and Lazare individually, despite the fact that the above-quoted cases often address corporate officers. A covered person under CERCLA includes an individual, corporation, or partnership. 42 U.S.C. § 9601(21).

had active roles in the day-to-day activities of Laga, if viewed as credible, could support an inference that Gal and Lazare knew of the decision to dump PCE into the ground through a crude system of underground pipes, and agreed to that decision, some of that very same testimony, if credited, would not support that inference. *See USX Corp.*, 68 F.3d at 826. The conflict in testimony is in part between former employees and their employers. Such conflicts in employee and management testimony occur regularly and are the stuff of trials — conflicts which are to be resolved by the finder of fact. Similarly, how much Gal and Lazare knew about how the Laga plant operated is also not crystal clear or without some discrepancies, specifically in light of the fact that Gal did visit the plant from time to time. "[I]ssues of knowledge and intent are particularly inappropriate for resolution by summary judgment, since such issues must often be resolved on the basis of inferences drawn from the conduct of the parties." *Id.* (citing *Anderson*, 477 U.S. at 255). Accordingly, third-party defendants' motion for summary judgment on liability under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3) is denied.

(c) Common Law and Equitable Claims Against Third-Party Defendants

Third-party defendants, in support of their motion for summary judgment, have brought various equitable and common law claims. They first contend that any claims asserted against former Panex shareholders did not exist at the time of Panex's dissolution or at the time of any shareholder distribution and that CERCLA claims did not arise until years later. Panex Br. at 33. Since there was no reason to suspect that such claims might arise, no equitable doctrines burdened the property as it was distributed to Panex shareholders. *Id.* Moreover, third-party defendants urge that with regard to Panex Co.'s more than 5,700 shareholders, "The thought that *all* of its former public shareholders or noteholders (like Gal and Lazare) would have to repay distributions they received decades earlier to satisfy claims that did not exist when they received those distributions boggles the mind." *Id.* at 35 (emphasis in original). They also emphasize, in an amorphous splicing of trust fund theory and constructive trust theory, that some wrong-

345

doing or fraud is required before such monies may be recalled. *Id.* The essence of third-party defendants' claims is that they are not liable under CERCLA because the statute was not enacted until 1980, well after the asset distribution to, and not within, the contemplation of the parties. This argument, a more sophisticated cousin of third-party defendants' argument that CERCLA is not retroactive, is without merit and squarely addressed by the Third Circuit in *Beazer East*, 124 F.3d 551.

In *Beazer East*, defendant operated wood treatment plants at various sites from 1934 until 1954, at which time certain of the parties executed a liquidation agreement. *Id.* at 555. The agreement provided for the assumption of liabilities:

> [Beazer], for itself, its successors and assigns, fully intending to become legally bound thereby, does hereby assume all of the liabilities and obligations of [ALT] of whatsoever nature, and does hereby agree to indemnify and hold harmless [ALT], its officers and directors, from and against all liability, loss, cost and damage in any way arising out of the said liquidation of ALT, including, without in any way limiting the generality of the foregoing, all liability, loss, cost and damage in any way arising out of the transfer of the property and assets of [ALT]. pursuant to the provisions [of this liquidation agreement].

*Id.* (brackets in original opinion). Years later, after environmental damage had been discovered and response costs incurred, plaintiff brought suit, which proceeded to a bench trial before reaching the Third Circuit. *Id.* at 555-6. The Court of Appeals held that the clear and unambiguous language of assumption in the liquidation agreement was sufficiently broad to encompass CERCLA liabilities.[46] *Id.* at 555, 556.

■■■ The Court of Appeals noted that generally at common law, "when one company sells or transfers all its assets to another, the

---

[46] The Court of Appeals supported this conclusion with reference to *City Investing*, 624 A.2d at 1198 (rejecting effort to introduce extrinsic evidence to aid interpretation of meaning of agreement phrase "any liabilities"), a case whose interpretation on various levels is disputed by the parties. As in *City Investing*, the liquidation provision before the Third Circuit in *Beazer East* "was clear and unambiguous and unlimited by any reference to the Delaware dissolution statute . . ." *Beazer East*, 124 F.3d at 565 n.14.

successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Id.* at 565 (citations omitted). There are, however, four exceptions to this general rule of successor nonliability: (1) where the purchaser of assets expressly or impliedly assumes the liabilities of the transferor; (2) where the transaction amounts to a de facto merger; (3) where the purchasing corporation is merely a continuation of the transferor corporation; and (4) where the transaction is fraudulently intended to escape liability." *Id.* (citations omitted). While CERCLA itself is silent on the issue of successor liability, the same general rule and its exceptions apply in the CERCLA context. *Id.*

The Third Circuit stated quite simply that, "An agreement entered into prior to the passage of CERCLA can allocate CERCLA liabilities." *Id.* (*citing Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206, 211 (3d Cir. 1994)). To determine whether a pre-CERCLA provision covers CERCLA liabilities, a court must look to see whether the pre-CERCLA provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims. *Id.* (citation, brackets, and quotation marks omitted). In so doing, the court must look to state law — in this case, Delaware law.

 The proxy statement sent to Panex's shareholders regarding the dissolution of the corporation disclosed:

**It is possible that the entire amount which will be held in the Liquidating Trust to cover contingent and other liabilities of Panex will be used to discharge such liabilities . . . . [A]lthough the Board of Directors believes that the amount of approximately $6 million which will be deposited in the Liquidating Trust will be sufficient to cover any liabilities which may arise during or after the Liquidation Period, there can be no assurance that this will be the case. If the amount held in the Liquidating Trust is insufficient to discharge fully *all liabilities* which arise after the Liquidating Trust is terminated, each Panex stockholder may be liable for any unpaid portion of such liabilities to the extent**

**of the liquidating distributions paid to him including, if applicable, the value of Wundies stock which he may receive as a liquidating distribution.**

(Bold in original, second emphasis supplied). The proxy statement in the case at bar is no less sweeping or inclusive than the liquidation agreement in *Beazer East.* As the Court observed of this language some years ago:

> . . . I'm interpreting the language, and the language says clearly to me that if something comes up and certain conditions exist, the money is called back, and that's a continuing responsibility upon those shareholders. Clear and simple. And I'm just a country boy from South Jersey with hayseed in my hair, but I can understand that.

Tr. of Nov. 21, 1994 Hr'g at 37. The proxy statement does not single out certain kinds of liabilities for which assets may be recalled from shareholders. It speaks generally of *"any* liabilities" and *"all* liabilities which may arise during or after the liquidation period." The Court simply will not engage in a redrafting of the language agreed to by the signatories of the corporate dissolution so as to carve out an exception to language which is absolute. If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent. *City Investing*, 624 A.2d at 1198 (citation omitted) (rejecting proffer of extrinsic evidence to explain the meaning of "any liabilities" language).

(d) Jurisdiction over the Panex Trust

Third-party defendants have made several arguments in support of their contention that any claims against the Panex Trust must be dismissed. They assert that (1) claims against the Trust must be dismissed for lack of jurisdiction; (2) that the Trust is not a "person" within the meaning of CERCLA; (3) that the Trust does not meet any of the criteria required to impose CERCLA liability; and finally, (4) that the Trust never assumed liability for unknown claims which arose only after Panex's capacity to sue had expired. Panex Br. at 75-81. The Court has already rejected the Laga defendants' fourth argument. Without going into great detail, this

Court has also previously held that it has jurisdiction over the Panex Trust itself and its Trustees. *In re Tutu Wells Contamination Litig.*, 157 F.R.D. 367, 375 (D.C.V.I. 1994). This finding has not been challenged on appeal and remains the law of this case.

 It is axiomatic that a dissolved Delaware corporation ceases to exist three years after its dissolution and a creditor cannot thereafter bring suit against it to enforce a corporate obligation. *Beazer East*, 124 F.3d at 567 (*citing City Investing*, 624 A.2d at 1195). This does not mean, however, that where a separate entity has received assets of a dissolved corporation and assumed its corporate liabilities a creditor may not bring a suit to enforce that obligation against the continuing separate entity. *Id.* (*citing City Investing*, 624 A.2d at 1191).

Third-party defendants have looked to the *Panex I* and *Panex II* decisions out of the Western District of New York as supporting their efforts to obtain summary judgment as to the Panex Trust and its distributees under third-party plaintiffs' so-called "derivative" claims. The district court, in interpreting Delaware law throughout its opinion, found that the proceedings in Delaware, and the Vice Chancellor's September 30, 1997 order, did not constitute "new evidence" for purposes of modifying its previous opinion. *Panex II*, No. 94-CV-0400E(H), slip op. at 4. The Successor Trust, created by Vice Chancellor Steele was "established as a successor entity to the Panex Trust and Panex, Inc." That Successor Trust is, however, entirely a creation of Delaware law and is presently not a party before the Court. The Delaware courts, interpreting their own common and corporate statutory law, have concluded that the creation of the new Successor Trust was an appropriate course of action, notwithstanding contentions that environmental claims were barred by §§ 325 and 278 of the Delaware Corporations Law. The Court will defer to the judgment of the Delaware courts, which have far more expertise in harmonizing their own law and are widely recognized for leadership in the area of corporate law, as against an outside court's analysis of Delaware law.

 While the Court had jurisdiction over the Panex Trust and its Trustees, the difficulty with third-party plaintiffs' current claims against the Panex Trust under their recoupment, restitution and

"trust-fund" theories, however, is that the Panex Trust no longer exists. The Court simply cannot pass upon any claims against, or arguments in support of summary judgment for, the Successor Trust because the Court has no jurisdictional basis for adjudicating the rights of parties not named in this action. The Court finds that it would be overstepping its bounds to conclude that because it had jurisdiction over the Panex Trust it follows that it has jurisdiction over the newly created Successor Trust.

Claims against the Panex Trust, therefore, must be dismissed without prejudice. Accordingly, the Court expresses no opinion on the merits of third-party defendants' arguments in favor of summary judgment and no opinion as to whether third-party plaintiffs' claims against these entities remain viable. Should the newly created Successor Trust be a party before this Court or a party in another jurisdiction, those arguments will have to addressed at that time if raised.

## IV. Conclusion

For all of the foregoing reasons, the Court concludes that third-party defendants Goldman, Sachs and the First Manhattan parties are voluntarily dismissed from this litigation without prejudice and without the award of costs. In addition, all remaining third-party defendants are entitled to summary judgment on third-party plaintiffs' RCRA claims, which claims shall be dismissed with prejudice. The Court will grant Panex Co.'s but deny Gal's and Lazare's motion for summary judgment as to liability under § 107(a)(2), 42 U.S.C. § 107(a)(2) of CERCLA. Esso's cross-motion for summary judgment under § 107(a)(2), 42 U.S.C. § 9607(a)(2) is also denied. The Court will grant Panex Co.'s but deny Gal's and Lazare's motions for summary judgment as to "arranger" liability under § 107(a)(3), 42 U.S.C. § 9607(a)(3) of CERCLA. The Court further concludes that these cost recovery actions under § 107 may be brought simultaneously with actions under § 113(f)(2) and (g)(2) for contribution, for which Gal, Lazare, and Panex Co. are also not entitled to summary judgment.

The Court is constrained to conclude that third-party claims under common law strict liability and equitable disgorgement must remain viable as these issues, though pled, in certain of the

350

parties' complaints, were not briefed. Moreover, much like its limited "officer or director" dismissal of CERCLA claims, the Third Circuit also only dismissed common law claims against Gal and Lazare "in their capacities as former officers and directors of Laga." *In re Tutu Wells Contamination Litig.*, 95-7280, slip op. at 11.

In furtherance of not interfering with a state court's own interpretation of its statutory law, the Court declines to decide claims against the Panex Trust, as this entity has been supplanted by the Successor Trust, an entity not before the Court and over which it has no jurisdiction.

Declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, given the current posture of this case and the Court's opinion of this day, is inappropriate at this time.

The Court will enter an appropriate order.

Dated: February 18, 1998.

### ORDER

THIS MATTER, having come before the Court on motions to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and alternatively for summary judgment pursuant to FED. R. CIV. P. 56(c) on behalf of third-party defendants Andreas Gal, Paul Lazare, Panex Co., and the Panex Industries, Inc. Stockholders Liquidating Trust; and

on a motion for summary judgment on behalf of Esso Virgin Islands, Inc. and Esso Standard Oil (P.R.) ("Esso") pursuant to FED. R. CIV. P. 56(c); and

on a motion to dismiss on behalf of third-party defendants Goldman, Sachs & Co. pursuant to FED. R. CIV. P. 12(b)(1), (2) and (6); and on motions to dismiss on behalf of First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom pursuant to FED. R. CIV. P. 12(b)(1), (2), and (6); and

upon subsequent cross-motions of Esso; the Government of the Virgin Islands Department of Education; L'Henri; Western Auto Supply Co.; and Texaco, Inc., Texaco Caribbean, Inc., and Vernon Morgan (collectively "Texaco") for voluntary dismissal without prejudice and without costs pursuant to FED. R. CIV. P. 41(a)(2);

The Court, having conducted oral argument on these motions on April 9, 1997 and November 12, 1997; and having reviewed the submissions of the parties, including exhibits attached thereto; and

having converted the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and alternatively for summary judgment under Fed. R. Civ. P. 56(c) filed by Gal, Lazare, Panex Co., and Panex Industries, Inc. Stockholders Liquidating Trust into a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c), the Court having concluded that the parties, having submitted numerous materials outside of the pleadings, had adequate notice of such conversion;

IT IS, on this 18th day of February, 1998, HEREBY

ORDERED that the motion of third-party plaintiffs Esso, Texaco, the Government of the Virgin Islands Department of Education, L'Henri, and Western Auto under Fed. R. Civ. P. 41(a)(2) for voluntary dismissal is GRANTED.

IT IS FURTHER ORDERED that third-party defendants Goldman, Sachs & Co., First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom are hereby DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that the motion of third-party defendants Goldman, Sachs & Co., First Manhattan Co., Firmanco Associates, and Daniel Rosenbloom for an award of costs and attorney fees is DENIED.

IT IS FURTHER ORDERED that all third-party claims, to the extent that they apply to the Panex Industries, Inc. Stockholders Liquidating Trust, are hereby DISMISSED WITHOUT PREJUDICE.

2

IT IS FURTHER ORDERED that Gal's and Lazare's motion for summary judgment as to liability under § 107(a)(2) and (3), 42 U.S.C. § 9607(a)(2) and (a)(3) under Fed. R. Civ. P. 56(c) is DENIED.

IT IS FURTHER ORDERED that Panex Co.'s motion for summary judgment as to liability under § 107(a)(2) and (3), 42 U.S.C. § 9607(a)(2) and (a)(3) is GRANTED.

IT IS FURTHER ORDERED that the motion by third-party defendants Gal, Lazare, Panex Co., and the Panex Industries, Inc. Stockholders Liquidating Trust for summary judgment pursuant to Fed. R. Civ. P. 56(c) as to third-party plaintiffs claims arising under CERCLA §§ 113(f)(2) and (g)(2) is DENIED.

IT IS FURTHER ORDERED that the motion by third-party defendants Gal, Lazare, Panex Co., and the Panex Industries, Inc.

Stockholders Liquidating Trust for summary judgment pursuant to FED. R. CIV. P. 56(c) of third-party claims arising under RCRA §§ 7001, 7002 and 7003, 42 U.S.C. §§ 6971, 6972 and 6973 is GRANTED, and such claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Esso's cross-motion for summary judgment pursuant to FED. R. CIV. P. 56(c) as to the liability of Gal and Lazare under CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2) is DENIED.

IT IS FURTHER ORDERED that the motion by third-party plaintiffs Esso, Texaco, L'Henri, Western Auto and the Government of the Virgin Islands Department of Education for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 is DENIED WITHOUT PREJUDICE.

No Costs.